# 1. STATE COURT DOCKET SHEET

TRAVIS COUNTY DISTRICT CLERK
# REGISTER OF ACTIONS
## CASE NO. D-1-GN-24-005391

| | | | |
|---|---|---|---|
| **ERICKA HOLMES** | | § | Location: **201st District Court** |
| vs. | | § | Judicial Officer: **201ST, DISTRICT COURT** |
| **UNIVERSITY OF TEXAS AT AUSTIN** | | § | Filed on: **08/26/2024** |
| | | § | |

---

### CASE INFORMATION

Case Type: **Discrimination**

Case Status: **08/26/2024  Open**

---

### PARTY INFORMATION

| | | *Attorneys* |
|---|---|---|
| **Plaintiff** | **HOLMES, ERICKA** | **BLEDSOE, GARY L.** |
| | | *Retained* |
| | | 512-322-9992(W) |
| | | |
| **Defendant** | **UNIVERSITY OF TEXAS AT AUSTIN** | |

---

| DATE | EVENTS & ORDERS OF THE COURT |
|---|---|
| | ## EVENTS |
| 08/26/2024 | ORIGINAL PETITION/APPLICATION (OCA)<br>Party: Plaintiff HOLMES, ERICKA<br>Atty/Pro Se: Attorney BLEDSOE, GARY L.<br>*PLAINTIFF S ORIGINAL PETITION* |
| 08/26/2024 | OTHER/NOTICE<br>*LETTER REQUESTING CITATION - UNIVERSITY OF AUSTIN AT TEXAS* |
| 08/26/2024 | OTHER/NOTICE<br>*EXECUTED CITATION UNIVERSITY OF TEXAS AT AUSTIN* |
| 08/20/2024 | **Citation**<br>UNIVERSITY OF TEXAS AT AUSTIN  served |
| 08/26/2024 | **Citation**<br>UNIVERSITY OF TEXAS AT AUSTIN<br>Issued |

---

| DATE | FINANCIAL INFORMATION | | |
|---|---|---|---|
| | **Plaintiff** HOLMES, ERICKA | | |
| | Total Charges | | 358.00 |
| | Total Payments and Credits | | 358.00 |
| | **Balance Due as of 09/06/2024** | | **0.00** |
| 08/26/2024 | Charge | Plaintiff HOLMES, ERICKA | 350.00 |
| 08/26/2024 | E-File Electronic   Receipt # 2024-035278<br>Payment | Plaintiff HOLMES, ERICKA | (213.00) |
| 08/26/2024 | Credit | Plaintiff HOLMES, ERICKA | (137.00) |
| 08/26/2024 | Charge | Plaintiff HOLMES, ERICKA | 8.00 |
| 08/26/2024 | E-File Electronic   Receipt # 2024-035384<br>Payment | Plaintiff HOLMES, ERICKA | (8.00) |

# 2. PLAINTIFF'S ORIGINAL PETITION

8/26/2024 8:46 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-005391
Stefany Vega juarez

D-1-GN-24-005391

Cause No. _____

| | | |
|---|---|---|
| Ericka Holmes,<br>*Plaintiff,* | §<br>§<br>§ | IN THE DISTRICT OF |
| v. | §<br>§ | TRAVIS COUNTY, TEXAS |
| UNIVERSITY OF TEXAS AT AUSTIN,<br>*Defendant.* | §<br>§<br>§ | 201ST, DISTRICT COURT<br><br>_____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW, Ericka Holmes ("Plaintiff"), complaining of The University of Texas ("Defendant"), and for cause of action would respectfully show unto the Court the following:

### I. DISCOVERY CONTROL PLAN

1.      Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4 and affirmatively pleads that this suit is not governed by the expedited-actions process in Texas Rule of Civil Procedure 169 because Plaintiff seeks monetary relief over $250,000.

### II. PARTIES AND SERVICE

2. Plaintiff, Ericka Holmes, is an individual residing in Travis County, Texas.

3.      Defendant, The University of Texas, is a public university located in Travis County, Texas, and may be served through its registered agent for service of process. authorized by Article 7, Section 10 of the Texas Constitution and is funded by the State of Texas with its principal office located in Austin, Texas. Defendant UT Austin may be served with citation by serving its President, Jay Hartzell, at Main Building, 110 Inner Campus Drive, Austin, Texas 78712, or wherever he may be found

### III. JURISDICTION AND VENUE

4.      The subject matter in controversy is within the jurisdictional limits of this Court.

5.      This Court has jurisdiction over the parties because Defendant is a Texas institution.

6.      Venue in Travis County is proper in this cause under Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code because all or a substantial part of the events or omissions giving rise to this lawsuit occurred in this county.

### IV. FACTS

Ericka Holmes was employed by the University of Texas from 2008 to 2023.  She is an African-American female and at the time of her departure she was more than 40 years of age.  Holmes is a Licensed Vocational Nurse who had performed quite well during her tenure at the University. Holmes evaluations show that she was a well performing employee.

The University Health Services Department provides medical services to students of the University of Texas.  In 2023 there were more than 51,000 students in attendance at the University. Students at the University must depend upon a smoothly functioning UHS in order to get proper medical care.   The mission of the University Health Services Department is as follows: Healthyhorns enhances the health and well-being of students' bodies, minds and lives in support of their academic and personal goals.

In 2020, during the pandemic, UHS had issued a directive for all General Medicine Staff to utilize their cell phones for official business, which could have led to the capturing of private health information or PHI on private cell phones.

The University's PHI policy is attached hereto as Exhibit A.

The figures below, along with their positions, will be mentioned below along with others. Because of their importance we are specifying who they are and the positions that they hold.

Plaintiff - Ericka Holmes

Assistant Director of Nursing, General Medicine - Amy Watts Garvey, Plaintiff's Supervisor since around 12/19/2022

Director of Nursing - Renee Mathews

Assistant Director of Nursing - Norma Arima, Plaintiff's Assistant Supervisor since around 1/16/2023

Senior Human Resources Coordinator - Tracy Brzozowski

Director of Business Services - Monica Dowd

HR consultant - Lauren Harper

Chief Compliance Officer - Jeff Graves

UT Physician - Dr. Ginger Bloomer

Executive Director & Chief Medical Officer - Dr. Terrance Hines

Urgent Care Nurse Manager - Deborah Riggs

During the Covid-19 pandemic the University had the General Medicine Clinic (GM) work from home to virtually address the needs of the student population. When the GM nursing staff, nurses and medical assistants (MA), returned to work on the University campus, the clinic experienced significant staffing shortages due to 6 nursing staff quitting and one staff member having experienced serious health issues, being unable to work a usual workload. This often left Ms. Holmes as the sole nurse to handle the entirety of GM's student health concerns. See Holmes email attached hereto as Exhibit B. During the month of September, Holmes worked 6 days straight without any other nursing staff to assist with GM Nurses patient load. Ms. Holmes wrote an email

to Human Resource to share with Management about hazardous working conditions on the 5th day.  Elizabeth Gonzalez, Assistant GM Manager, communicated to the GM staff, how their only two nurses: Holmes and the nurse with serious health issues, were doing an outstanding job under the circumstances, since the nursing staffs return to the University Clinic.  Elizabeth Gonzalez left UHS shortly thereafter.  Despite the accolades, Holmes understood there was a greater ongoing and potentially serious risk to students they served because of the new lack of leadership, additional duties she and her fellow nurse were assigned, and the growing  unreasonable responsibilities placed on the Medical Assistants and her and the one other nurse who Ms. Holmes often assisted. Ms. Holmes knew that something needed to be done.  Almost overnight, Holmes' supervisor claimed that Holmes was doing inadequate work, only a short while after saying she had done an outstanding job.  This was after Holmes raised issues regarding staffing and the risk to their patients.  Holmes successfully challenged this nefarious attempt to downgrade her work, so the allegation by her supervisor was determined to be unfounded by the University at a meeting with Renee Mathews that occurred on or about January 23, 2023.  After acknowledging that there was no evidence to support the negative reference to Holmes and so it could not be accepted, she said to the astonishment of Holmes that they nonetheless should keep it in her file.  Mathews, however, admitted that it would be inappropriate to use this evaluation against her.  The evaluation was in fact used against Holmes in the Level One Reminder, providing a basis for the discipline that was rendered.

On December 16th, 2022, it was announced Amy Watts Garvey, a young white female below the age of 40, had filled the vacant position of GM Nurse Manager. The 3 nurses Garvey would supervise were: Ericka Holmes employed at UHS 14 years, a fairly new nurse from Urgent Care sent initially to help the two GM nurses, and a new hire who started approximately two

months prior to Garvey. Garvey worked one week in GM before UHS closed for winter break. January 3rd, 2024 Garvey met all of the GM nursing staff except for Holmes, who was on vacation and returned to the clinic on January 17th, 2023.

Holmes requested a meeting with Garvey once she had realized the job duties she had performed for more than 14 years had been stripped away. January 26, 2023, Holmes met with Garvey who gave Holmes a list of 6 job responsibilities that changed the complete nature of her job. Garvey had Holmes doing primarily assignments that the non-licensed nursing staff could do. Garvey informed Holmes she would find the time to get Holmes trained and checked off on a new ear irrigation technique that all the staff had already completed while Holmes was on vacation. Garvey spoke briefly about the ear irrigation changes and its policy and procedure. Holmes asked follow up questions about what was said because what Garvey said was ambiguous at best. Recognizing her inability to give a definitive answer on the use of ear irrigation tips , Garvey stated she would ask the Nurse Director for clarification and would get back to Holmes with a definitive answer.

Garvey failed to follow up with Holmes as she stated she would.  Nor did Garvey bother to have  Holmes trained and checked off on the new technique either.  Holmes continued to perform ear irrigations using the technique UHS had most recently trained and checked her off on. A technique UHS had not changed in more than 7-8 years.

Nearly a month later, February 23rd, 2023,  Holmes received a Kudos letter from Dr. Bloomer, GM doctor, for doing a fabulous ear irritation on one of her patients. This patient had experienced other staff's multiple attempts at ear irrigations which were all unsuccessful. Garvey called Holmes to her office to congratulate her on the Kudos. Although knowing she had not gotten back with Holmes as she stated she would at their January 26th meeting, nor trained or checked

off Holmes, she requested the following for her and Norma Arima, new Assistant Nurse Manager hired just prior to Garvey, "We would love to learn from you and have you teach us. Would you be willing to teach us?"  Holmes, who had already started feeling the physical and mental effects of being subjected to the incredibly toxic and hostile work environment Garvey had created for her, informed Garvey anyone of the MA's would be able to show her as well. Garvey merely reapplied, "We want you to teach us please, so if you get one today could you please come get us?"

That following Monday February 27th, 2023, a MA working in Holmes' assigned clinic, asked Holmes if she wouldn't mind doing the ear irrigation for the doctor she was working with, because she was not feeling well. Holmes, always willing to lend a hand to her coworkers and for the welfare of the patients the clinic served, agreed to do so.  Just a few moments after agreeing to perform the procedure for her coworker, Norma Arima, a Latin older female and new assistant nurse manager hired just before Garvey,  popped up in Holmes' assigned clinic stating she was there to observe Holmes perform the ear irrigation.

Armia was fully aware Holmes was using the older technique yet decided to renounce her preceptor responsibilities to just watch Holmes then quietly dismissed herself from the patient's room. Unknowing, byway of the retired ear irrigation technique standards,  Holmes successfully completed the ear irrigation to the ordering doctor's delighted satisfaction. It was not long after the procedure was done, that Holmes was called into the manager's office by Norma, where Garvey, who had known she had not informed Holmes about the definitive plan to implement the new ear irrigation technique and still neglected to bother having Holmes trained and checked off on it, yet fully aware Holmes unknowingly had been performing an outdated procedure as early as that previous Friday when she congratulated Holmes on Dr. Bloomer's kudos.  Despite this

compliment she said nothing and simply waited to reprimand Holmes even though the ear irrigation was successful.

Holmes, feeling even the more downtrodden by Garvey's antics, had no words for what was blaring evident as a setup, merely replied with yes' and ok's and left vowing she would no longer do ear irrigations until she was trained and checked off as Garvey had stated once again she still needed to have to have Holmes do.

Not much later after that day, MA staff who had already been initially trained and checked off on the new ear irrigation technique on or around January 12th, 2023 while Holmes was out on Christmas vacation, told Holmes who was working in her assigned clinic, they were being called into Garvey's office, one by one, and quizzed about the ear irrigation technique they had been using. A few MA's who had worked at UHS for some years, said they admitted to doing the procedure Holmes had just been reprimanded on and said Garvey told them no that was not correct and retrained them on the spot. This disturbed Holmes greatly knowing she was once again being excluded from pertinent training necessary to do her job successfully.  Curiously, Holmes was chastised by Garvey for interacting with them.

A number of negative things occurred subsequent to this.  Garvey continued with her behavior of openly questioning Holmes' work to put Holmes down in front of her co-workers and to let them know Holmes was persona non grata.

On or about  March 24, 2023,  Garvey made a clear move to formally start the termination process. Holmes received a Level 1 Reminder at the end of day at 4:57 p.m. citing events on the following dates:  January 26th, February 9th, February 15th and February 27th.  Holmes had no disciplinary or counseling events on any of those dates. With no previous offenses, notes, counseling, write-ups or teachings and because she was aware that the University Code of Conduct

prohibited discrimination and fabricating information Holmes decided to fight the Level 1 Reminder. Holmes immediately contacted Human Resources to schedule a meeting, she quickly responded to the Level I Reminder and showed where it was clearly false and inaccurate by submitting questions concerning the write up to Garvey and she also initiated the formal complaint process with the University's Conflict Management and Dispute Resolution department.

Holmes met with Human Resources on or about March 29, 2023, letting them know the Level 1 Reminder was unfounded, not in accordance with University rules, based on false information and that it was discriminatory. As they suggested, Holmes submitted a written response that detailed the incidents as alleged by Garvey and made it clear that the fundamental allegations were false. Garvey had made allegations about incidents or meetings on specific dates. Plaintiff possessed hard evidence to show that Garvey was lying.

March 28, 2023 Tracy Brzozowski, HR rep, informed Garvey that Holmes requested a meeting with HR to report and discuss Garvey's false allegations prior to meeting with Holmes on March 29, 2023. Garvey was displeased with Holmes and Holmes's action and Garvey took an incredible step to harm Holmes, their patients and even the University—they left Holmes alone as the only nurse to take care of all the patients then at UHS. Holmes was not even informed of this until she realized she was alone, only to discover that there was yet another training to which she had not been invited nor was she informed.

Holmes submitted written transcripts of recordings she had of the dates Garvey referred to in the Level 1 Reminder and sent them to Garvey, Mathews and HR. She also played audio for Mathews to hear what actually happened in the alleged meetings as compared to what Garvey had claimed. After realizing her untruths were exposed, Garvey decided that she would simply amend the write up. Incredibly, a revised Level 1 was sent to Holmes on or about April 10th, 2023. In

the renewed Level 1, Garvey eliminated the false allegations that she had made about February 9th and February 15th.  Garvey then indicated that no other actions would be taken and the Level 1 reminder would go to Holmes personnel file.  The "Revised Version" as Garvey labeled it, still included the January 26th false allegation about a discussion with Garvey about ear irrigations and a Monday February 27th, 2023 meeting that also included false allegations.  Falsely, the Revised version refers to an August 5, 2022 annual performance review that had been determined invalid and that occurred when Garvey was not even employed there. Mathews admitted this should not have been used.  The agreements reached with HR on the March 29th that the prior evaluation should not be used were not adhered to and the new allegation was brought forth still including the matter which HR had agreed was improper to use—the alleged prior discipline from 2022. Importantly University officials have admitted this was inappropriate, and they knew this prior to the date of final termination.

Early to Mid April, nearly a full month since Holmes had been reprimanded about her ear irrigation procedure, tired of asking others to fulfill her orders because she had still not been trained nor checked off for the new ear irrigation technique, to  Garvey and asked if she would so kindly demonstrate the new ear irrigation technique was written up. Ironically, Garvey's demonstration was an abysmal failure that turned into substandard patient care when she blatantly refused to listen to Holmes's respectful attempts to instruct her according to performing the procedure in order to rectify the matter and complete the providers order.  Instead, Garvey lied to the provider who reevaluated the patient with the understanding that the irrigation had been done correctly. She stood silently while knowing the provider was misdiagnosing, prescribing and instructed the patient to return to the clinic after the failed irrigation.  Holmes, also aware of the repercussions of false billing, spoke up and asked the provider for the opportunity to irrigate the patient's ear again.

With Garvey's outright refusal to retry the procedure with instruction form Holmes, Holmes was made to carry out the procedure, which she completed successfully. Holmes immediately set up a meeting with Garvey's supervisor in hopes the outcome would not be like the previous reports of the hostile and oppressive work environment that Garvey had created which had gone ignored.

Holmes wondered what she could do to stop the machine from rolling her over, so on or about April 14, 2023, With solid irrefutable evidence, Holmes met with Nursing Director Renee Mathew, white female more than 40,  for a little over an hour to report the recent incident of Garvey's medical negligence and intention to commit billing fraud. Holmes played recordings as indicated above, that contradicted Garvey's slanderous Level 1 Reminder and Arima's admitted she neglected her duties. Mathews never stated concern about the possibility of Holmes capturing HIPAA nor did Mathews admonish Holmes for recording meetings with Garvey.  During that meeting Holmes gave Mathews full access to her binders and recordings had never contained HIPAA.  Mathews, GM Manager prior to Garvey's predecessor, had always encouraged the staff to take and keep detailed notes and store important memos, emails and training materials etc in notebooks. Mathews had given Holmes the notebook that contained the very information Holmes was sharing with her that day.

Mathews, acknowledges in a response to EEOC, she suspected the hour-long conversation of her acknowledging Amy's discrimination, Amy and Norma's medical misconduct and UHS and formal University departments negligence in upholding federal law to at the least investigate Holmes numerous complaints of mistreatment and discrimination was caught in a recording. This is the moment all neglecting parties became desperate which created the driving force to quickly stop Holmes from gathering more proof of their misconduct by executing a 3 step process: (1) finding out what Holmes had;  (2) obtain what Holmes had; and (3) then get rid of Holmes. Though

she was aware that Garvey wanted to terminate her because of her age, Holmes had been unaware of the racial component and that her genuine efforts to right such wrongs had just put her under siege.

In another surprise move, the meeting that took place on or about April 18, 2023 was an event to implement this plan.  Holmes believed without a shadow of a  doubt all the nefarious wrongs would be corrected in accordance with University's bylaws and policies. But when Holmes was informed she had been called because an individual had complained about the  notebooks she had shared with Mathews days before, it was evident that she was a target.

Mathews asked if Holmes had someplace other than work to keep it. Holmes informed both Matthews and Brzozowski the notebooks were important for work.  Holmes admitted to having it out during clinic hours because it was essential for her to do her job and it needed to be readily accessible since it contained all of the important medical memos, pharmacy phone numbers, master sheets form forms needed by providers etc. and the other containing Holmes work schedules, inter and intra office communication, personal work notes and all things relating  to Holmes's job, job requirements and expected performance.

After having acknowledged that it was legal and  that there was no policy prohibiting this, Brzozowski of Human Resources requested Holmes stop recording because it was against the culture of the University.  Holmes explained to Matthews and Brzozowski that once Holmes realized she was being victimized by various kinds of discrimination, lying and fabrication, Holmes felt it was essential to record her meetings with superiors and/or to document those events because Holmes could not trust Garvey to tell the truth nor the departments that were doing nothing to help her after repeated requests.  In other words, Holmes actions were in part her engaging in protected activity. The only interaction that had been transcribed by Holmes had already been

given to Garvey, Matthews and the HR Department, all who did absolutely nothing but allow Garvey to victimize Holmes further. Holmes was assured in that meeting that there was no University rule against an employee tape recording employee meetings, so she could continue and do this though they would prefer that Holmes not do so. The value of the recording was obvious because they forced Garvey to back off in at least one of her fabrications in the Level 1 Reminder. Holmes believed it was essential to ensure her right to be protected from illegal discrimination and retaliation by taking notes and recording meetings with people who had already demonstrated the a propensity to lie about her, to her and on her or do they nothing when it was their absolute responsibility to do something matters were essential to ensure her right to be protected from illegal discrimination and retaliation. The University officials seemed to have an outsized concern for this Black Woman with a Notebook.

On April 21st and in an action that was completely inconsistent with the April 18th meeting, Holmes met behind closed doors with Tracy Brzozowski, Monica Dowd, a white female, and Renee Mathews, all who had been captured stating inconsistencies by Holmes. Holmes was asked but not instructed to stop recording the meeting and when Holmes declined, Tracy stated that they would record the meeting too. For the time Holmes had informed UHS she had recorded meetings about her work performance, they were now concerned of the possibility that HIPAA/PHI could have been captured. They wanted any and all recordings Holmes had ever made and any and all documents in the binder that was reported to be a distraction. There was serious concern about whatever other documentation Holmes had for discriminatory misconduct by University officials such as Garvey. Confused, Holmes told them they have copies of much of the information kept in it. Seeking to find what documentation of discrimination might exist, Mathews informed Holmes they wanted her other binder, the one kept out of sight. They also

wanted her recordings in another attempt to find out what evidence of discriminatory conduct might exist. When Holmes inquired if their requests were legal, Brzozowski informed Holmes her recordings were essentially state property.

Holmes was placed on leave and given notice from Tracy that Holmes was the subject of a HIPAA investigation. Holmes was ordered that day 4/21/24 by Tracy to turn her recordings and records over to University officials for them to review. Though Holmes believed this was discriminatory and retaliatory, Holmes still held out hope somehow that once people see that the tapes exposed lies and injustice and showed that some of Holmes's superiors were not acting legally or in the student's interest, that there would be someone within UT's administration who might attempt to correct the illegal activities. Holmes was at the time a 15-year employee of the University and approaching 54 years old, so she hoped to be able to keep working until retirement within 8 years from then.

Fearful of disciplinary action, termination, Holmes turned over the demanded materials on Sunday, April 23rd, since Holmes was ordered to submit them by Monday the 24th . She was worried that if she submitted them on Monday it would be too late and she might lose her job.

Though they may have been involved earlier, on or about the 27th of April, Amy Garvey and Human Resources involved University Lawyers and ordered Holmes to sign an attestation that said she had turned over all recordings she had made over 15 years at the University and that involved any University business. This was different from what had been requested in the previous meetings between Holmes, Mathews, Dowd and Brzozowski at the end of April. Holmes, afraid of the repercussions of not signing, made changes to the very broad wording to make it more specific to the actual events.

Mathews and Brzozowski had determined what  Head Nurse Deborah Riggs had indicated it is not uncommon for employees to tape record work sessions and there is nothing improper about it.  Because Plaintiff did not know whether in the 14 previous years she made a recording or even knew where it was and because she was told by Renee and Tracy that they only wanted matters about her work performance, she made 2 changes to the attestation, signed it and provided it to the University on the 28th of April.  She also surrendered her recordings, notes and copies of her emails.  In turning the documents, Holmes explained that she never had a problem with turning over recordings as she had done voluntarily with Mathews, but she felt intimidated because there were three UT employees telling her that the UT lawyers were making these demands:  "I felt cornered in a meeting room by three people saying that their legal team was demanding my personal belongings". They wanted to require Holmes to say she had never recorded anything prior to 2023 and that she had no document she had not turned over—even though she had tendered some documents that University officials declined to accept.  Holmes had turned over the tapes and the binders but now they Brzozowski and Mathews and their lawyer group wanted more than what they agreed to.  Holmes sent back a proposed modified change to the attestation, not wanting to sign an attestation that was unreasonable or impossible for her to be sure of.  Brzozowski acknowledged that any such attestation must be reasonable.

On or about the  5th of May, Tracy Brzozowski contacted Holmes and informed her that the Legal Department had rejected Holmes' proposed changes. Tracy told Holmes she would be required to sign the attestation as is with no changes.  Holmes wrote an email to legal and asked Tracy if she would mind giving it to them.  In it, Holmes expressed her sincere desire to sign their attestation. Holmes expressed the concerns she had in doing so because it is very broad.  She

informed them she had been a dedicated employee of the UHS for 15 years and to attest that she had submitted every and all items that pertained to University's business would be impossible.

Step 2 Appeal hearing February 27, 2024:

Holmes note while handling her own case without legal assistance, University Legal asked for was different from what they had initially requested but Holmes complied with the request in the fullest:

"I was reminded yesterday that you wanted the notes and papers in my binder and the recordings I had made since I started recording this year. Why can't this be stated? But for the letter that differs from what I was initially asked. I attest, I have to the best of my knowledge, given you what you have requested. This is so because I do not know exactly what every and all of what a UT business means to you. The pages from my notebook, the transcript I made and had submitted to Amy, UHS HR, and Renee Mathews on March 31st and the recordings concerning my work duties and work performance with Amy and Norma, meeting concerning my performance evaluation with UHS HR, meeting about performance evaluation with Renee Mathews and meetings pertaining to my recordings I had made to protect myself from my managers false accusations. I have been open and consistent, it's legal that I have changed things with different requests. As this all started, I am only fighting for the truth asking to be treated fairly."

Step 2 Appeal hearing February 27, 2024: Brzozowski indicated that Plaintiff had a right to put together information to pursue a discrimination claim if she felt there was one.

Around May 5th, Holmes again was beside herself and again raised the issue of a hostile environment and discrimination. Holmes decided to reach out to the University's compliance office, trying to get someone to stop this steamroller. The University that day sent another broad request that they knew from her previous response she would think was impossible to sign.

Holmes responded on May 8th: "Have you read the new attestation. It is pretty much saying the same thing as the one before, but now I have to attest to two things. This is what was given to me at the meeting on April 21, 2023. How am I supposed to attest, to such a broad request, that I have submitted all of this." She provided where they were asking her, a nurse, to say that she had gone back and looked at all electronic information, back up files, flash drives, smart phones, answering machines, cell phones, icloud, drop box and many other areas. This was draconian.

This language appeared to be a trap. She had no way of checking out those items and she had already mentioned that she did not know what she had done in the years past but the employment recordings had started in 2023 and had been turned over. It appeared as though they were wanting to get something which they could then use to terminate her. The request to her was impossible and the University's lawyers knew that. Brzozowski indicated at one point that they needed to see additional information to see if there were any HIPPA violations. Clearly they were out to get her since after she gave them everything they wanted and found no HIPPA violations they were trying to get more.

On or about May 8th, the University Legal Department sent another proposed attestation, but it was essentially the same as the previous one. Holmes sent them a communication indicating that there was no substantive difference in the attestations. She said thenshe was extremely terrified for her job, family and well-being and that this new demand to sign by close of business on the 8th caused her to be anxious and stressed. She said for example she had made a recording of a sexual assault lecture to share with her daughter but had no idea where it was. She said none of any other recording would have any HIPPA information. She noted again that she had given everything that UHS HR and Renee had requested. Again, Holmes appealed for a reasonable attestation.

Holmes also decided to add to the earlier misconduct and discrimination complaint since nothing had happened to address her problems, so she then filed an ethics complaint regarding the illegal and unethical treatment that she was receiving.

Around May 9th or 10th, Mathews reported to Holmes that nothing improper was found in either her recordings or her notebooks. Shortly thereafter, the Dispute Resolution Unit Holmes had contacted for help reported they would be unable to reach her case timely. Holmes discovered this was because Garvey would not make herself available for such a meeting to take place.

Holmes informed Mathews that she believed that Garvey's actions were responsive to in retaliation for Holmes's her claims of a hostile environment and discrimination. She also complained that Garvey had not been responsive to her obligations to respond to Holmes about her Level 1, and Mathews replied defensively and said that Garvey's schedule was not a cause of any problem.

On or about May 11th Holmes received a 3rd proposed Attestation from who? with a 24-hour turnaround. Again, this proposed attestation was essentially the same as the prior drafts and still objectionable to Holmes. Holmes again informed them that she felt uncomfortable signing this vague and very broad attestation. It requested recordings of university business instead of the work related recordings and required an attestation about the characteristics of anything she had done the previous 14 years. Holmes complained about the wording of the proposed attestation and offered an alternative:

"By signing below, I, Ericka Holmes, attest I do not, nor have I ever possessed, any University business that contains Protect Health Information. I also attest, as of January 2023, any and all recordings, transcripts or documents of University business pertaining to encounters concerning my work performance that were captured by me or on my behalf do not have Protected

Health Information and were surrendered for the University's investigation into HIPAA violations."

On May 17th, Garvey sent a communication to Holmes indicating her "Intent to Terminate" Holmes employment with the University. The reasons stated were as follows: i. the refusal and failure to sign the Request for Audio and Transcription Attestation; ii. Recording audio and risking capturing Protected Health Information (PHI) of University business in both office and clinical setting and storing the audio on personal mobile devices and cloud-based storage;" iii. Refusal to stop recording audio in the workplace when it was requested; and iv. The focus on your personal notebook during work time and its clinical spaces which created several concerns, including the distraction to other staff." That same day Ericka Holmes went to Lauren Harper, noted that she had gone to discuss these things with her a month earlier, and appealed for some kind of relief or assistance.

Mathews indicated that it was not insubordination for Holmes to refuse to sign the attestation but Graves said it was. There is no law or policy regarding taking an action where you are at risk of capturing PHI. She did not capture PHI but they still went forward with this allegation. UT officials have indicated there is no policy against recording in the workplace and they did not order Holmes to stop recording, but somehow they decided to go forward on an alleged insubordination for failing to stop recording. Further, they have acknowledged that Plaintiff had a right to protect herself from discrimination by accumulating evidence (including tape recordings), as she informed them. She had already exposed one of her supervisors for lying.

On May 17th, 2023 Holmes met with the Human Resources, Garvey, and Mathews. This was the first meeting with Garvey in weeks, but there were several meetings in April and May that

Holmes had with both Mathews and Brzozowski.  Holmes was given until May 19th to respond to what the proposed termination.

In Holmes's proposed attestations she was seeking to find a compromise to where she could give them all documents and assurances they needed, but not be attesting to something that required knowledge where it was impossible for her to have.  What was frustrating to Holmes was that she would reach agreements with Mathews and Brzozowski only to have someone, probably Graves or other University lawyers, inform them that it was inadequate.

Ironically, when the University responded to the EEOC, it represented that the broad attestations demanded by Graves were never required.  There was never any intent for Holmes to be able to comply.  The University was all over the place:

A.    Submitted to the EEOC

May ninth we elaborated that we only need recordings that happened in clinical spaces, hallways, nursing stations and other UHS office spaces, and that we did not need recordings from social events or from staff development days.

 B.    An Attestation provided to Holmes

 "By signing below, I, Ericka Holmes, attest I do not, nor have I ever possessed, any University business that contains Protect Health Information.  I also attest, as of January 2023, any and all recordings, transcripts or documents of University business pertaining to encounters concerning my work performance that were captured by me or on my behalf do not have Protected Health Information and were surrendered for the University's investigation into HIPAA violations."

 C.    Jeff Graves Stated

No. I wanted her to say she had turned over all recordings she had made, period, without it being limited to pertaining her encounters concerning her work performance.

Holmes responded to this latest proposed termination on May 19th, explaining her position on each accusation.  The explained why she should not be held responsible for any of the 4 reasons given for proposing to terminate her.  She explained the problem with the wording of the attestations and their broadness and how they were inappropriate.  She explained how there were no HIPAA violations regarding her and some of the provisions cited clearly had not applicability to her or her situation.  She stated that no HIPAA information had been found and how things had deteriorated.  And she stated that she was asked to stop recording when it was not against policy and when she was behind closed doors with a need to protect herself from false accusations.  As to the binders she said the binder is for her work and that unlike the other nurses she does not have a place to store her binder so she takes it with her.  Debbie Riggs, the Head Nurse, had indicated that other nurses use such binders in order to have easy reference to important UHS medical information and guidance from memos and other communications.

On or about May 22nd, Holmes met with the Brzozowski and Mathews again and they who? indicated that after reading Holmes's response they did not see a reason to reverse Garvey's decision.  She was again terminated on this day.  Holmes again was given 5 days to appeal her termination and Holmes did so.  However, Holmes's termination challenge was delayed because of the discrimination and retaliation complaint she had filed.  On May 30th, Holmes filed another discrimination and retaliation complaint, specifically complaining about age discrimination.  See complaint attached as Exhibit D.  Plaintiff was finally terminated on or about the 5th of June 2023.  See Exhibit E.

Holmes was informed that University Policy 5-2420 applied to Holmes's termination. This policy requires that an employee be provided the names of any person bringing allegations against another employee before it can be utilized. Policy 5-2420 provides in pertinent part that the University must: "inform the employee, either in person or in writing, of the reasons for the proposed disciplinary action, the facts upon which the supervisor relies, the names of any persons who have made statements about the disciplinary incident and the content of such statements".

There was alleged to be an unnamed nurse who allegedly felt uncomfortable with the existence of Holmes's notebook and that was referenced as one of the bases for the termination. The University completely refused to provide the name of that individual. Further, the University admitted that the decision to terminate Holmes was made or influenced by a group meeting that included HR, Mathews, Graves, Harper who would later handle her appeal ironically and Harper and a number of other persons but they declined and refused to provide the names to Holmes. The other names and the names of Graves and Harper were never provided to Holmes. Incredibly, at one of the appeal meetings to discuss Holmes's termination Holmes was not even permitted to ask questions about who was in the room. The policy is very clear about the importance of providing basic information to the employee so that they can: "give the employee an opportunity to respond to the charges either orally or in writing within a reasonable time and to persuade the supervisor that the evidence supporting the charges is not true." Holmes to this day has no idea who was allegedly intimidated by Holmes's notebook that was reviewed and determined to include nothing inappropriate, and Holmes would like to know who was in the room deciding Holmes's fate. Holmes was denied all of these basic rights.

DIA, responsible for investigating the claims, took long periods to do any work on the case, uploading documents more than a month after the filing and taking more than 2 months to say that

they needed more information.  This DIA process is used as a means of perpetuation of the racial discrimination and retaliation, collecting information from the individual when there is no intention to actually honestly investigate their case.  On August 3rd, 2023, after the long delay, Holmes informed DIA that its questions did not seem to be designed to actually conduct an investigation into Holmes's allegations.  Two days later, Holmes received a belligerent and retaliatory communication from John Dalton, Assistant to the Vice President.  It misstated the record and was a clear manifestation of bias.  Holmes sought to bypass this DIA process because it did not seem to be designed to get at the truth, but they even delayed in processing her request to discontinue that part of the investigative process.  Holmes was never provided the data requested to challenge her termination, most if not all of which should have been turned over under applicable rules or policies of the University.

Holmes provided solid proof to the University that Holmes was never trained on the technique that Garvey said she desired.  Deborah Riggs, the Urgent Care Nurse Manager, a white femele, told University officials that a supervisor cannot discipline an individual for not using a technique on which they have not been trained and that the University has a responsibility to train its employees prior to holding them accountable for policies or procedures.  Riggs said not only is one required to train but there is a procedure to check off that each staff member has been trained and trained adequately.  Riggs also informed University officials before Holmes was finally terminated, that there is nothing wrong with recording training sessions and that it is appropriate for an employee to record a supervisor in a private office.  She said a closed office is not a healthcare setting.  The records of the University don't show any check off for Holmes as having been trained on the procedure.  The University had maintained that Holmes was insubordinate for using the ear irrigation technique that she used, even though the only time it was presented for

training had been in January when Holmes was not present.  In reference to the issue of the proposed attestation, Holmes secured acknowledgements by University officials that there was no prohibition under the University's policy or state law that prohibited her from tape recording meetings.  The University maintained that she was reckless about recording at the Health Center, even though she only did it in private rooms when discussing her work matters and not HIPPA matters, and it disregarded proof that others had taken photos and videos from areas where patient information was more likely to be acquired or accessed.  She even provided an example of this, but it was of no moment.  There was never a desire to find out about HIPAA information, only to get what was in those binders and then to conclude that she was untrue in signing the attestation. They were attempting to get her to represent that she had turned over documents that they had declined to accept, among the many problems with what they were requiring.

Holmes fought vigorously to maintain her job.  There she was a 54 year old nurse who had just been terminated from her job.  During this ordeal and after she has suffered high blood pressure, a loss of self-worth, increased anxiety, depression, loss of confidence, brain fog, fear because a young white nurse was able to come in and lie and ruin her name and reputation and turn her professional and personal lives upside down, sleepless nights and a host of other manifestations of the mental pain and anguish and loss of self-worth.

Plaintiff timely filed with the EEOC which accepted her complaints of age discrimination, race discrimination and retaliation.  Plaintiff has timely filed her lawsuit and all conditions precedent to the bringing of her suit have been met. See Exhibit F.

### V. CAUSES OF ACTION

**Count 1: Race Discrimination**

Plaintiff incorporates by reference all preceding paragraphs.

Defendant's conduct described herein constitutes discrimination on the basis of race in violation of Title VII of the Civil Rights Act and the Texas Labor Code.

Plaintiff, an African-American female, belongs to a protected class.

Plaintiff was qualified for her position, having performed well during her tenure at the University from 2008 to 2023, as evidenced by her evaluations.

Plaintiff suffered adverse employment actions, including but not limited to: a. Significant changes to her job responsibilities, stripping her of many duties; b. Exclusion from training sessions; c. Receiving unwarranted disciplinary actions; d. Being placed on leave; and e. Ultimately being terminated from her position.

Similarly situated employees outside Plaintiff's protected class were treated more favorably. Specifically, a young white female below 40 was appointed as Plaintiff's supervisor and was responsible for many of the adverse actions taken against Plaintiff.

Defendant's proffered reasons for the adverse employment actions are pretextual, as evidenced by the inconsistent and changing justifications provided for the disciplinary actions and termination.

**Count 2: Age Discrimination**

Plaintiff incorporates by reference all preceding paragraphs.

Defendant's conduct described herein constitutes discrimination on the basis of age in violation of the Age Discrimination in Employment Act and the Texas Labor Code.

Plaintiff was over 40 years of age at the time of the discriminatory actions and her termination.

Plaintiff was qualified for her position, as demonstrated by her long tenure and positive performance evaluations.

Plaintiff suffered adverse employment actions as detailed in paragraph 23 above.

Plaintiff was treated less favorably than similarly situated younger employees, as evidenced by:

a. The appointment of a supervisor substantially younger than Plaintiff;

b. The significant changes to Plaintiff's job responsibilities implemented by the younger supervisor;

c. The exclusion of Plaintiff from training sessions while younger employees were included.

**Count 3: Retaliation**

Plaintiff incorporates by reference all preceding paragraphs.

Defendant's conduct described herein constitutes unlawful retaliation in violation of Title VII and the Texas Labor Code.

Plaintiff engaged in protected activities, including but not limited to: a. Challenging the unfounded Level 1 Reminder on March 29, 2023; b. Filing complaints about racial discrimination and retaliation prior to her termination; c. Reporting concerns about unreasonable responsibilities and risks to students.

Plaintiff suffered adverse employment actions as detailed in paragraph 23 above.

There was a causal connection between Plaintiff's protected activities and the adverse actions, as evidenced by:

a. The temporal proximity between Plaintiff's complaints and the adverse actions;

b. The escalation of adverse actions following each instance of Plaintiff's protected activity;

c. The inconsistent and pretextual reasons provided for the adverse actions.

**Count 4: Wrongful Termination**

Plaintiff incorporates by reference all preceding paragraphs.

Defendant's termination of Plaintiff violated specific laws, including anti-discrimination statutes, and therefore constitutes wrongful termination under Texas law.

Plaintiff's termination was in violation of public policy, as it was based on: a. Plaintiff's race and age; b. Retaliation for Plaintiff's protected activities; c. Plaintiff's refusal to sign overly broad attestations that could have waived her legal rights.

The reasons provided for Plaintiff's termination, including alleged improper ear irrigation technique and potential HIPAA violations, were pretextual and not supported by evidence.

**Count 5: Hostile Work Environment**

Plaintiff incorporates by reference all preceding paragraphs.

Defendant's conduct described herein created a hostile work environment in violation of Title VII and the Texas Labor Code.

Plaintiff was subjected to unwelcome harassment based on her protected characteristics of race and age, including but not limited to: a. Significant and unwarranted changes to her job responsibilities; b. Exclusion from necessary training sessions; c. Unwarranted disciplinary actions; d. Being singled out for scrutiny regarding her work practices and personal notes; e. Being subjected to repeated demands to sign unreasonable attestations.

The harassment was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment, as evidenced by: a. The frequency of the discriminatory conduct; b. The severity of the actions taken against Plaintiff; c. The humiliating nature of being excluded from trainings and having her work constantly questioned; d. The unreasonable interference with Plaintiff's work performance caused by the hostile environment.

There is a basis for employer liability as the harassment was perpetrated and/or sanctioned by Plaintiff's supervisors and other management-level employees.

**Count 6: Violation of Due Process**

Plaintiff incorporates by reference all preceding paragraphs.

Defendant's conduct described herein violated Plaintiff's due process rights.

Plaintiff had a property interest in her employment, as evidenced by her long-term employment with the University and the University's own policies regarding employee rights.

Plaintiff was deprived of this property interest through her termination.

The deprivation occurred without due process of law, as evidenced by: a. The University's failure to follow its own Policy 5-2420 in Plaintiff's termination process; b. The University's refusal to provide Plaintiff with the names of individuals making allegations against her; c. The University's failure to allow Plaintiff to adequately respond to the allegations against her; d. The University's failure to provide Plaintiff with a fair and impartial hearing before her termination.

The violation of due process rights was further exacerbated by the University's interference with Plaintiff's ability to challenge her termination, including delays in the termination challenge process and refusal to provide necessary information for Plaintiff to mount an effective defense.

Respectfully submitted,

/s/ Gary Bledsoe

The Bledsoe Law Firm PLLC
State Bar No. 02476500
6633 Highway 290 East #208
Austin, Texas 78723-1157
Telephone: 512-322-9992
gbledsoe@thebledsoelawfirm.com

Robert Notzon
**Law Office of Robert S. Notzon**
1502 West Avenue
Austin, Texas 78701
512-474-7563
robert@notzonlaw.com

Nickolas A. Spencer
**Spencer & Associates, PLLC**

808 Tavis Street, Suite 100
Houston, TX 77002
Phone: 713-863-1409
Email: nas@naslegal.com
Bar no: 24102529
Attorneys for Plaintiff

# EXHIBIT A

# HIPAA Introduction

Content by UT Austin

# Protected Health Information (PHI) Overview

Content by SANS; last updated 2023



As healthcare professionals, we treat patients and look after their well-being. As a result of our efforts, we often learn sensitive and potentially embarrassing information about people and their health conditions.

Each of us has a responsibility to treat this information as confidential and respect patient privacy.

We certainly wouldn't want everyone to know our deeply personal medical conditions. Any piece of individually identifiable health information such as a person's medical records, health care payments, or prescriptions is considered to be Protected Health Information, or PHI.

If PHI is stored digitally, it is called electronic protected health information – or ePHI.



In addition, we have a legal responsibility to protect patient's PHI. This responsibility was defined by the US Congress in 1996 as the Health Insurance Portability and Accountability Act, known as HIPAA. Under the new HIPAA Omnibus rule that went into effect on September 23rd, 2013, this requirement applies to any organization that creates, receives, transmits, or maintains protected health information in electronic, paper, or oral form.

Here are some examples of when and how to protect PHI:
- We should protect PHI from public viewing.
- Protect conversations from being overheard when they contain PHI.
- Refrain from discussing patients and their PHI beyond what is necessary to conduct business. This concept is known as the "principle of minimum necessary standard" and it helps guard the patient's privacy and protect our organization from liability.
- We should protect PHI on computers, handheld devices, and medical equipment.

In upcoming videos, we will discuss protecting sensitive health information in more depth, including:
- Proper storage and disposal of PHI
- Emailing and faxing PHI

- Safeguarding computers that store PHI
- Social media and PHI





As healthcare professionals, our patients trust us with their health and privacy. They believe that we have their best interests at heart. Please only share patient data with authorized personnel who need to use protected health information to complete their process.

As providers, we must obtain the patient's written authorization for any use or disclosure of their PHI that is not part of the process of patient care or treatment.

By respecting these guidelines, we help ensure that our organization protects our patients' sensitive information and that we remain compliant with industry and regulatory standards.

# Protecting Confidential Information That is Not PHI

Content by SANS; last updated 2023





Never leave any sensitive documents or medical records unattended at your desk. Instead, secure sensitive documents when you leave them, such as locking them in a secure cabinet. In addition, whenever you leave your computer or medical station, make sure the screen is password protected. This helps to ensure that unauthorized personnel cannot access your computer while you are away.

Only use systems or mobile devices authorized by our organization to store, process or transmit sensitive information. Do not copy or store sensitive information to any unauthorized systems or accounts, such as personal laptops or personal email accounts. If you are authorized to have privileged access to a system, always log in with your unique, non-privileged user ID, then elevate your privileges only when it is needed. Never log in directly as a privileged user.

If you transfer sensitive information, use secure, authorized methods that support strong encryption. Do not transfer sensitive data using insecure means, such as email, unless you are using specialized encryption software that you have been properly trained to use. You must have prior approval to store sensitive information on removable media or portable storage systems, such as CDs, DVDs, USB flash drives and external hard drives. If you have prior authorization, then all sensitive data

should be encrypted using approved encryption software.

Never store or share sensitive information on public internet or Cloud services such as Dropbox, Apple iCloud or Google Drive unless you have prior authorization from management.

# Physical Security of PHI

Content by SANS; last updated 2023

23 0875



While much of our training has focused on technology, we cannot forget the physical world. In some ways, it is simpler for individuals to physical steal PHI. For example, someone may enter our organization pretending to be a contractor or doctor, then silently steal medical records from nurses' stations or garbage bins.

To protect against people from entering our facilities and stealing PHI, only authorized personnel are allowed access to certain areas. Access to restricted areas can be controlled through the use of devices such as locked doors, identification badges or biometric sensors. For example, the hospital wing that serves as the nursery and labor delivery area is typically restricted to mothers and immediate family. These units have security cameras, telephones, mirrors and tracking systems in place to protect the mother and baby.

Another way we protect our patients and employees is by identifying authorized personnel through the use of identification badges. These should be worn at all times. If someone does not have proper identification, please immediately escort them to the front entrance or security desk. In addition, if a door requires a badge for access, make sure that anyone coming through the door behind you uses their badge as well. Sometimes people will pretend to be an employee or family member and

simply try to walk in through the door by drafting behind you.

Finally, do not leave any secured doors open, as this allows unauthorized personnel easy access to restricted areas.





In addition to securing our facilities, we need to protect PHI stored on physical media. For example, PHI may be sent via FAX, written down on a paper chart, printed from an electronic medical record system or jotted down on a small scrap of paper. PHI may also be on labeled prescription bottles, hospital identification bracelets and lab containers.

Physical items containing PHI must be secured following our record management procedures.

When PHI exists on paper or plastic and is no longer needed, it should be disposed of in secure bins designed for collecting sensitive data or it should be shredded, pulverized or burned so that the PHI is rendered unreadable, indecipherable and cannot be reconstructed.

Please refer to our organization's procedures for disposal of physical PHI.



PHI can also be stored electronically on mobile devices like laptops, smart phones and USB drives. You may not realize it, but one of the most common ways PHI is compromised is from lost or stolen devices such as these. Make sure you always physically secure your devices when you are away from them. For example, if you have to leave your laptop in your car, be sure to lock it up in your truck first.

When you leave your work area, make sure you lock away confidential documents or devices, such as in a locked file cabinet or an office safe. An awareness of our surroundings plays a vital role in protecting confidential information.

Looking for identification badges, closing secured doors behind ourselves and the proper handling and disposal of paper, plastic and electronic media helps build trust with our fellow employees and patients.

We have covered a great deal of material in this module and appreciate your hep. If you have any questions or need additional information, please contact the Help Desk or our Information Security team.

24

# Cameras in Medical Offices

Content by SANS; last updated 2023

25



Cameras are everywhere and they warrant a special discussion for healthcare organizations. The use of filming and picture taking must be taken seriously, as these activities can violate the privacy and security of not only our employees, but our patients.

All cameras and filming devices should be used in a professional, ethical and legal manner that is consistent with all of our organization's existing policies. Many healthcare organizations use cameras and video surveillance to prevent theft and monitor public areas for safety. For example, we may place cameras near entrances and exits to capture visitors who enter and leave our facility, or place cameras in store rooms and hallways to ensure the safety of equipment. However we should only install security cameras in public areas where they will not compromise any issues of privacy or trust with our patients.



Healthcare organizations have also recognized that photographs that identify or cause the identification of patients constitutes PHI, and they have prohibited staff from taking photographs of a patient without the patient's consent.

Our organization may have special cameras and filming devices used for purposes of care, diagnosis or training. These devices should only be used by authorized individuals and in accordance with our organization's policies.





The use of personal mobile devices such as smart phones or tablets to collect, store and transmit patient information also poses privacy concerns. Personal mobile devices with cameras should never be used to record images of patients. Since personal devices may not be owned or managed by our organization, it is difficult to ensure that these devices are properly secured to protect PHI.

Please review our organization's policies on the use of personal mobile devices, especially those with built-in cameras. You may observe a fellow employee, a patient or a visitor taking photographs with a mobile device, which may constitute a violation of our organizations policies. Please contact our security team or Privacy Officer if you should observe this behavir

Failure to protect the privacy of our patients from the consequences of using mobile device cameras inappropriately will subject our organization to liability and potential monetary fines.

# Properly Disposing of PHI

Content by SANS; last updated 2023





Data on computer media, such as hard drives and USB drives, must also be destroyed and made unrecoverable. Unfortunately, when it comes to digital information, this is not as simple as you might think.

When people dispose of digital media, such as donating a mobile phone, replacing a copier machine or selling an old computer on eBay, they often forget that there is usually sensitive information on the devices. Whoever has access to these devices can access any of the information on them. As such, any device that has stored, protected health information must have that data wiped before the device is disposed of.

# Protecting PHI in Social Media

Content by SANS; last updated 2023





Social networking websites are one of the most exciting new technologies on the internet. These virtual, online communities allow people to connect to each other anywhere in the world. On these sites you create an account, post information and share information with your friends, family and coworkers.

What makes these sites so fun is how easy it is to share information with others.

However, with all these amazing capabilities come risks that you need to be aware of.

You may be suspended or fired if you disclose another person's health information on a social networking site. There are consequences to both you and our organization.

As a healthcare organization, we must abide by HIPAA regulations to protect patients' privacy and confidentiality. Our organization may face civil and monetary penalties for the disclosure of PHI.

Because of this tremendous responsibility to care for the health and welfare of others, you rae being asked to be diligent in protecting PHI both on and off the clock.



Our organization emphasizes professional behavior within and outside the workplace during working and non-working hours. Even if you post something on a social networking site on your own time, you are still a representative of our organization and must abide by our policies concerning electronic communications on our company's network, as well as any device that uses the internet.

We have taken great care to write policies on electronic communications, mobile devices and social networking to protect your and our patient's confidential information. These policies apply to employees, volunteers, trainees, and others that perform work on behalf of our organization.

Please be aware that any disclosure of PHI, even a small, innocuous one, can constitute a violation of our organization's policies and HIPAA privacy regulations.

43

EXHIBIT B

**Holmes, Ericka M**

**To:** Brzozowski, Tracy L
**Subject:** RE: Reporting lack of staffing an potential for mistakes

Tracy,
I was speaking of the day I sent the email.  We were so low on staff,  Liz was working for two providers in GM B by herself.  We had I was in my second week working what use to be a 4 lvn's job and

**From:** Brzozowski, Tracy L <t.brzozowski@austin.utexas.edu>
**Sent:** Wednesday, September 21, 2022 10:53 AM
**To:** Holmes, Ericka M <e.holmes@uhs.utexas.edu>; Dowd, Monica <monica.dowd@austin.utexas.edu>
**Subject:** RE: Reporting lack of staffing an potential for mistakes

Hi Ericka –

Was there a specific incident that occurred that prompted this email to us? We'd be happy to share additional information you can provide to senior leadership.

Thanks,
Tracy

Tracy Brzozowski, BBA, SPHR, SHRM-SCP | Senior Human Resources Coordinator | University Health Services & Counseling and Mental Health Center | The University of Texas at Austin | 512.475.8356 P  512.471.0898 F | Campus Mail A3900

Email is not considered a secure medium.  Therefore, confidentiality cannot be guaranteed.

**From:** Holmes, Ericka M <e.holmes@uhs.utexas.edu>
**Sent:** Tuesday, September 20, 2022 12:38 PM
**To:** Brzozowski, Tracy L <t.brzozowski@austin.utexas.edu>; Dowd, Monica <monica.dowd@austin.utexas.edu>
**Subject:** Reporting lack of staffing an potential for mistakes

I, Ericka Holmes, would like to go on record by saying,  "UHS has not done anything to decrease the provider, STC clinic, or nurse visit patient flow to accommodate the lack of GM support staff, ie the nursing staff, thus greatly increasing the probability of unintended mistakes in patient care.  It also shows UHS's great disregard of the GM's support staff's health, wellbeing and repercussions for mistakes that the staff can occur by trying to process a full schedule as if we were fully staffed."  This on top of continued low wages and the inability for current staff to get time off to take care of home has brought moral in GM to an all time low.

Thank you for your time,
Ericka Holmes



17

1

**Holmes, Ericka M**

| | |
|---|---|
| **From:** | Spradlin, Elisa M |
| **Sent:** | Thursday, September 29, 2022 11:37 AM |
| **To:** | Holmes, Ericka M; Hines MD, Terrance S |
| **Subject:** | RE: 2:1 w/Dr. Hines/Dr. Spradlin/Ericka |

No!  This is something different.

We decided to meet individually with all GM nursing staff, including you.

Elisa

Elisa Spradlin, M.D.  |  Associate Director of Medical Services and Clinical Operations/Assistant Chief Medical Officer  |  University Health Services  |  The University of Texas at Austin  |  512-475-7745 / fax 512-475-9693  |  healthyhorns.utexas.edu

Email is not considered a secure medium.  Therefore, confidentiality cannot be guaranteed.

**From:** Holmes, Ericka M <e.holmes@uhs.utexas.edu>
**Sent:** Thursday, September 29, 2022 11:14 AM
**To:** Hines MD, Terrance S <t.hines@uhs.utexas.edu>
**Cc:** Spradlin, Elisa M <e.spradlin@uhs.utexas.edu>
**Subject:** Re: 2:1 w/Dr. Hines/Dr. Spradlin/Ericka

Doctors,
Would this meeting be in regards to the write up I received, directly after meeting with you on 9/27/22, concerning my performance while having to cover both clinics alone?

Thank you,
Ericka Holmes, LVN
Sent from my iPhone

On Sep 28, 2022, at 5:06 PM, Hines MD, Terrance S <t.hines@uhs.utexas.edu> wrote:

24

**Holmes, Ericka M**

| | |
|---|---|
| **From:** | Spradlin, Elisa M |
| **Sent:** | Tuesday, September 27, 2022 11:04 AM |
| **To:** | Holmes, Ericka M |
| **Cc:** | Gonzalez, Elizabeth; Mathews, Renee L; Hines MD, Terrance S |
| **Subject:** | Meeting today |

Ericka,

Dr. Hines and I have reviewed the email you submitted to HR last week. We would like to speak with you.

Please meet us in his office in Administration from 3:00 to 3:30.

I'm copying Liz so that she is aware of your need to step away from the office for this meeting.

Elisa Spradlin, M.D. | Associate Director of Medical Services and Clinical Operations/Assistant Chief Medical Officer | University Health Services | The University of Texas at Austin | 512-475-7745 / fax 512-475-9693 | healthyhorns.utexas.edu

Email is not considered a secure medium. Therefore, confidentiality cannot be guaranteed.

1

**Date:** 9/27/22

**Employee Name: Ericka Holmes**

| Unsatisfactory Behavior/Actions | | |
|---|---|---|
| ☐ Tardiness | ☒ Performance Standards | ☐ |
| ☐ Absent | ☐ Professional Conduct | ☐ |

| Documentation of Discussions   DATE: | |
|---|---|
| Unsatisfactory behavior/actions | Incomplete management of nursing tasks from 9/8/22-9/22/22. |
| Date/time of incident | 9/22/22 |
| Date supervisor discussed with EE | 9/27/22 |
| Details of incident, including witnesses | 1. Nurse out of office nurse tasks were not monitored. <br> 2. Gender care tasks lists were also not monitored, and patient messages were not responded to. <br> 3. Test results for Dr. Bloomer were not reported to alternating provider. <br> 4. Unapproved time in office before business hours. You were logged in from 4:42am-5:15am. <br> On 9/22/22 you left work unexpectedly at 4:30 pm and stated all work for both sides was caught up and nothing pending that needed attention right away. |
| Business impact | 1. Poor patient care outcomes & no provider support <br> 2. Unsatisfactory customer service due to no response to Gender Care patient messages. <br> 3. Potential for patient care deficiency due to delayed test review note coverage <br> 4. Confusion for covering nurse and lack of communication with supervisor |
| Employee response | 1. *See Back* <br> 2. <br> 3. <br> 4. |
| Next steps discussed | Ericka understands what is expected of her and agrees to the following: <br><br> Ericka will utilize time management to ensure that all task lists are getting reviewed. <br><br> Ericka will also make sure the task lists are reviewed every 2 hours and finally at end of business day, 5pm. <br><br> Ericka will reach out to ask for assistance from other LVN or RNs when needed. |

1

We are understaff + if i could
for a nurse who in out, so covering
Both Clinics phone calls and nurse
visits.  I do not see how I can
Be penalized for working for
two people (counting me for two weeks
While the other nurse was out Because
UHS had her on LWOP. I will Be
taking this to HR and on Because
~~there~~ there is Something wrong
when I come to work and
am penalized for having to
do the Job of multiple people.

| | |
|---|---|
| | Ericka will get approval to work outside business hours, Monday-Friday 8am-5pm and for any other overtime. |
| The following immediate and sustained action must be taken by the employee. Failure to do so may result in further disciplinary action up to and including termination: | |

## Discipline History

☒ First   ☐ Second   ☐ Other

Previous discipline for this subject occurred on: DATE
n/a
_____

Follow up meeting will be held on: DATE

## Signatures

Employee: _____   Date: _____

*Your signature on this form indicates that we discussed the situation. It does not necessarily mean that you agree that the infraction occurred.*

Manager: _____   Date: 9/11/22

Details of follow up meeting:

| Documentation of Discussions DATE: | |
|---|---|
| Unsatisfactory behavior/actions | |
| Date/time of incident | |
| Date supervisor discussed with EE | |
| Details of incident, including witnesses | |
| Business impact | |
| Employee response | |
| Next steps discussed | |

| Documentation of Discussions DATE: | |
|---|---|
| Unsatisfactory behavior/actions | |
| Date/time of incident | |
| Date supervisor discussed with EE | |
| Details of incident, including witnesses | |
| Business impact | |
| Employee response | |
| Next steps discussed | |

2

**Holmes, Ericka M**

| | |
|---|---|
| **From:** | Holmes, Ericka M |
| **Sent:** | Thursday, September 29, 2022 5:27 PM |
| **To:** | Spradlin, Elisa M |
| **Subject:** | Re: 2:1 w/Dr. Hines/Dr. Spradlin/Ericka |

Dr. Spradlin,
My write-up has everything to do with the concerns I stated in the email to HR,
that you, Dr. Hines and I discussed; "GM Nursing Staff working full schedules
while severely understaffed yet getting unfairly discipled for doing so."
This was the only reason I asked.
I will be out of the office once again tomorrow but, I still would like to
meet with you and Dr. Hines.  Could we do so via phone call at the same
time?
Thank you,
Ericka Holmes
Sent from my iPhone


On Sep 29, 2022, at 12:37 PM, Spradlin, Elisa M <e.spradlin@uhs.utexas.edu> wrote:


Ericka,

I just reread this – I was not aware you were written up, and the write up was not related to the meeting with me and Dr. Hines.

The meeting that has been scheduled is unrelated to anything else – it's just a new initiative we're trying to open lines of communication with GM nursing staff.

Elisa Spradlin, M.D. |  Associate Director of Medical Services and Clinical Operations/Assistant Chief Medical Officer  I  University Health Services  |  The University of Texas at Austin  |  512-475-7745 / fax 512-475-9693  |  healthyhorns.utexas.edu

Email is not considered a secure medium.  Therefore, confidentiality cannot be guaranteed.

**From:** Holmes, Ericka M <e.holmes@uhs.utexas.edu>
**Sent:** Thursday, September 29, 2022 11:14 AM
**To:** Hines MD, Terrance S <t.hines@uhs.utexas.edu>
**Cc:** Spradlin, Elisa M <e.spradlin@uhs.utexas.edu>
**Subject:** Re: 2:1 w/Dr. Hines/Dr. Spradlin/Ericka

Doctors,
Would this meeting be in regards to the write up I received, directly after meeting with you on 9/27/22, concerning my performance while having to cover both clinics alone?

Thank you,
Ericka Holmes, LVN
Sent from my iPhone



1

**Holmes, Ericka M**

| | |
|---|---|
| **From:** | Holmes, Ericka M |
| **Sent:** | Thursday, September 29, 2022 5:32 PM |
| **To:** | Brzozowski, Tracy L; Ericka Holmes; Dowd, Monica |
| **Subject:** | Re: Discuss a write up received |

Tomorrow afternoon via zoom, if possible, would be great, I have been out of the office since the incident.
Thank you,
Ericka Holmes

**From:** Brzozowski, Tracy L <t.brzozowski@austin.utexas.edu>
**Sent:** Thursday, September 29, 2022 3:57 PM
**To:** Ericka Holmes <erickaholmes@msn.com>; Dowd, Monica <monica.dowd@austin.utexas.edu>
**Cc:** Holmes, Ericka M <e.holmes@uhs.utexas.edu>
**Subject:** RE: Discuss a write up received

Hi Ericka,
What day/time works for you?

Thanks,
Tracy

**Tracy Brzozowski, BBA, SPHR, SHRM-SCP**  |  Senior Human Resources Coordinator  | University Health Services & Counseling and
Mental Health Center | The University of Texas at Austin  |  512.475.8356 P  512.471.0898 F |  Campus Mail A3900

Email is not considered a secure medium.  Therefore, confidentiality cannot be guaranteed.

-----Original Message-----
From: Ericka Holmes <erickaholmes@msn.com>
Sent: Thursday, September 29, 2022 1:05 PM
To: Dowd, Monica <monica.dowd@austin.utexas.edu>; Brzozowski, Tracy L <t.brzozowski@austin.utexas.edu>
Subject: Discuss a write up received

I would like to meet with you in regards to a write up received concerning my performance while having to manage both
nurse offices in the absence of two of our nurses.

Thank you,
Ericka Holmes
Sent from my iPhone

1

**Holmes, Ericka M**

| | |
|---|---|
| **From:** | Holmes, Ericka M |
| **Sent:** | Thursday, September 29, 2022 5:57 PM |
| **To:** | Hines MD, Terrance S |
| **Subject:** | Re: 2:1 w/Dr. Hines/Dr. Spradlin/Ericka |

Thank you!

---

**From:** Harvard, Paula <paula.harvard@uhs.utexas.edu> on behalf of Hines MD, Terrance S <t.hines@uhs.utexas.edu>
**Sent:** Thursday, September 29, 2022 5:44 PM
**To:** Holmes, Ericka M <e.holmes@uhs.utexas.edu>
**Subject:** RE: 2:1 w/Dr. Hines/Dr. Spradlin/Ericka

Ericka,
I converted your meeting to Teams.

Take care,

**Paula Harvard** [she/her] | Executive Assistant to the Executive Director/Chief Medical Officer | University Health Services | The University of Texas at Austin |
(512) 475-8220 | SSB 2.212 | Campus Mail A3900 | healthyhorns.utexas.edu

**\*Email is not considered a secure medium. Therefore, confidentiality cannot be guaranteed.**

-----Original Appointment-----
**From:** Holmes, Ericka M <e.holmes@uhs.utexas.edu>
**Sent:** Thursday, September 29, 2022 5:37 PM
**To:** Harvard, Paula
**Subject:** Accepted: 2:1 w/Dr. Hines/Dr. Spradlin/Ericka
**When:** Friday, September 30, 2022 11:00 AM-11:30 AM (UTC-06:00) Central Time (US & Canada).
**Where:** In-Person: Dr. Hines' Office

I really would like to keep this meeting Is there any way we can meet via phone call or zoom?

21

1

**Holmes, Ericka M**

| | |
|---|---|
| **From:** | Holmes, Ericka M |
| **Sent:** | Wednesday, October 5, 2022 12:59 PM |
| **To:** | Gonzalez, Elizabeth |
| **Cc:** | Dowd, Monica; Tracy Brzozowski |
| **Subject:** | Follow up questions concerning write up on 9/27/2022 |

Follow up questions to my write up received 9/27/22.


1. Nurse out of office Nurse tasks not monitored:
I often monitor other nurses' boards without putting time and date stamps as I feel it is like checking my own. To meet the continuous demand of doing both East and West, nurse task boards alone, I date and time stamp all providers as I feel it most important to do so. At the time I monitored Stacy's board, there were no items that needed my attention.
Please proved the item/s and their date/s in question that were posted and were not dealt with correctly?


2. Gender Care tasks lists were also not monitored, and patient messages were not responded to:
Elizabeth and I both discussed, at the time of the write up, how we were not aware of the demand to monitor the Gender Care Tasklist, let alone did we ever know it was available for students to write directly to. We further discussed how Stacy Fitzhugh had expressed her desire to take responsibility for the list, in which it was made so, and she alone monitors it. Stacy, as for the nursing staff who monitor task boards or any of the GM nursing staff, is the only one on the Gender Care Committee and attended the Gender Care meetings and is the point of contact for the Gender Care provider's and anyone else with Gender Care questions. Upon my return to the clinic on 9/23/22, Stacy made me aware, for the first time, that students can email questions directly to the Gender Care task board. After detailed research for Gender Care task board expectations and updates on the task board such as Stacy had given me that day, I have found none. Which further substantiates your, my and quite possibly, Sydney Thompsons unawareness of the need to monitor the Gender Care task board since we handle any provider or student Gender Care concerns through the standard means of the Nurse Task Board or phone call to which I have answered and processed without complaint.
Please provide the dates and the patient's messages I failed to respond to.


3. Test results for Dr. Bloomer were not reported to alternating providers.
Please provide the dates, times and patient's test results that I failed to report to an alternating provider.


4. Unapproved time in the office before business hours. You were logged in from 4:42am -5:15 am.
   On 9/22/22 you left work unexpectedly at 4:30 pm and stated all work for both sides was caught up and nothing that needed attention right away:
I am not quite sure what this is saying, but here is my effort to respond until I get further clarification.
DATE CORRECTION: On "9/21/22", I had to leave work 30 min early, unexpectedly. I did receive approval to do so. Having had to cover the West and East office that day I made sure I bought up everything from loose papers, tackboards, Nurse hold folder and provider's verbal requests, to a point that nothing needed immediate attention right away, by the time of my departure. There should have been a good 10 minutes or so before someone needed to drop everything to get in the nurse's office.
Since Elizabeth and I were the only nurses in the clinic that week, I sincerely regretted having to text message her at 2:56 am to report I would need to be out that day due to a family emergency. In efforts to lighten the burden she would encounter as being the only nurse in the clinic I took the initiative to stop by on my way out of town to take care of anything that may have come in during that evening after I left early, and the clinic

1



closed. I did as much as I could and at 5:24a.m. I texted Elizabeth, letting her know I had just left the office after trying to help clear up the board. I had no intention of writing this down on my timesheet, but was told by Monica Dowd that I had to.

During the pandemic and up until I had covid a few months back I was afforded the ability to work the nursing task boards at home which sometimes resulted in time worked outside normal business hours. Even now, while I am up at work before business hours, I get asked a work related question or two by provider's who are also early at work preparing for their day and I kindly oblige by doing the research to answer their questions, since serving our provider's is also doing the greater good for our students and I have yet to mark my time down.

The write up states there was incomplete management of the nursing tasks for 9/8/22-9/22/22. Please provide all documents in question of the 11 days notated.

I thank you for your quick response,
Ericka Holmes

29

2

EXHIBIT C

**Holmes, Ericka M**

**From:** Gonzalez, Elizabeth <elizabeth.gonzalez@uhs.utexas.edu>
**Sent:** Thursday, May 5, 2022 12:09 PM
**To:** uhs-gm-nursingstaff@utlists.utexas.edu; Thompson, Sydney
**Subject:** [gmnursingstaff] GM changes

I know I have gone around and updated everyone as best I could about changes coming to GM, but think it would be helpful to put it in an email.

I'll start with the provider changes. This summer some of the providers will be switching sides and offices. Because of this, we also need to make adjustments. Until we are fully staffed, we need to make sure we can provide coverage. We currently only have 8 MAs and that leaves us with 2 MAs/pod. So starting in the summer, MAs will also be changing. I understand that change is hard and some have been with the same provider for a long time, but everyone should be able to work with any provider regardless. It's done when we have call-ins or when staff is out on vacation. We don't have enough staff to assign an MA to every provider, so coverage needs to be done by everyone. I am still working on this and trying to figure a few things out. When I do have it figured out, I will update everyone. But know this won't happen until the summer.

Staffing shortage. I know we are struggling with a staffing shortage right now. Please know that I absolutely appreciate everyone's teamwork on keeping GM running. I am working with Renee and HR to get some MA postings up. The only concern is getting them trained. Tammy is our only MAII right now and her plate is spilling over. I have decided to post for an MAII position, but am hoping to hire 2 (still working this out with HR). These positions will be posted internally throughout UHS. One will require a 12month commitment and I'm still working out the other one. I'm hoping whoever takes that position will be able to help Tammy and hopefully be ready to starting learning how to train new employees. The summer is a great time to hire, since things slow down and we can get prepared for fall.

We have also been short in the LVN office. We should have 5 LVNs and right now, we only have Ericka and Stacy who have been keeping us above water. I don't know how you do it, but y'all rock it. We also have Sydney who has been a huge help and is just awesome. We had an LVN posting up since Rhonda left and no one was applying for whatever reason. So instead of posting for 3 LVN positions, I decided to hire 2 RNs. They will be taking on some extra administration work to help me out. Things like schedules, SA contact /TOR and other things. They will be running around on the floor to help support staff in time of need as well.

*[handwritten]* announcement of new nursing position and document acknowledgement of my work contribution.

Lastly, the future GM Manager. If you don't already know, we did hire a manager. They are working through some paperwork, and once that is done, they will start onboarding. My last day is June 3rd (I go on LWOP for the summer). Renee will be helping out in GM and getting the new manager trained up. I will return in Aug.

I hope this email has helped with any confusion and uncertainty you may have. I think GM is headed in the right direction, it is just getting over that hump. We will be okay!

Let me know if you have any questions.

*Confusion + uncertanty was noted*

*here in may!*  *although it*

*going on for two years*

**Elizabeth Gonzalez, BSN, RN** (she/her/hers) | Assistant Nurse Manager/General Medicine
The University of Texas at Austin| UHS: 512.475.8379 | SSB 2.410| Campus Mail A3900 UHS
*Email is not considered a secure medium. Therefore, confidentiality cannot be guaranteed.* *had already been*

*before.*

2

EXHIBIT D

**Brzozowski, Tracy L**

| | |
|---|---|
| **From:** | Holmes, Ericka M |
| **Sent:** | Friday, May 19, 2023 6:10 PM |
| **To:** | Brzozowski, Tracy L |
| **Cc:** | Mathews, Renee L; Dowd, Monica; Harper, Lauren E; Watts Garvey, Amy E |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

I would like to state that I have been dedicated to University Health Services for 15 years. I love my job, the people I work with and the patients I care for. I am the oldest UHS Nurse in the GM Clinic and I have 14.5 years of seniority over Amy Garvey who has about 5 months and other four RN's with less. Although I am an LVN, I have maned the clinic on my own on many occasions. I know my job and do my job well and I would love to continue work with UHS if possible.

Fact. There is no policy against making recordings that do not contain HIPAA.

Fact. The national employment rules suggest I have the right to make such recordings when there is no written policy by the employer.

Fact. These events transpired after I voluntarily shared recordings I captured within the above parameters, with Renee Mathews, Nurse Director to show that I was being subjected to discrimination based on age and other factors.

1. I have only asked for specificity it the attestations and an account for all the materials I submitted. The University's inability to state the facts concerning this investigation what prolonged this process. Furthermore, being demanded to submit materials I voluntarily brought for you to review, then being threatened to sign a very broad attestation that I have submitted any and all of that material is unreasonable, oppressive, and designed to lead to my termination and not in good faith, because you only asked for it after I submitted all of my documents to you.

2. Fact. I demonstrated the appropriate judgment and took the necessary precaution to be sure no PHI activity was captured. Let me repeat the investigation findings, "No HIPAA violation was found." I use appropriate judgment and vet the conversation's purpose before I record. I would not nor have ever put my colleagues in the position to be at risk. Correlation doesn't equal causation. Every year I refresh my knowledge and successfully pass Healthcare Security Awareness (HIPAA) training module. Again, the investigative findings show NO HIPAA violations were found in any of the material I submitted.

3. Fact. The investigation stated, NO HIPAA information was found. So, I do not know how this storage statement applies to me. However, it is evident at this time, I am being singled out and retaliated against. A belief I have strongly suspected since I received the level 1 reminder. It is evident in the very correspondences, schedules, and recordings of my performance meetings I surrendered for investigation, and witnessed with Amy's curt interactions with me. Additionally, I am requesting a formal investigation be done on every employee at UHS who has ever mad a recording or video in the business office and or clinic settings on their mobile device.

4. Fact. At both meetings, I was asked to stop recording behind closed doors in the administrative office, far away from the clinics. Instead of HIPAA information being discussed, I was being interrogated about by recordings. Per the top two stated facts, I recorded in effort to protect myself form further false allegation. Since it was evident that UHS HR and Nurse Director have done nothing right the wrongs that I have been subjected to. While such rules may prohibit recording of protected conversations, a

1

majority of conversations covered by such policies have no relation to such conversations held on dates April 18th and April 21, 2023.

5. Fact. I have stated numerous times to Renee, UHS HR and Amy, if she would have ever asked me, I have two white binders. In one, I put my email correspondences, schedules, and notes of University business and put it in my backpack under my work station. In the other, I have University business by way of pharmacy numbers, Provider's NPI's, UHS Tax ID, and the like. Each binder contains no Protected Patient Information. Since we no longer have a nursing office to store such information, nor have I ever been afforded the opportunity to work in the two enclosed offices near the front of the clinic that Amy allows the other RNs; I keep the second binder with me at my only workspace as is essential to my job duties.

Finally,

  My recordings are undeniable proof that I have been falsely been accused of inappropriate conduct by Amy Garvey. Renee Matthews, heard the recordings and agreed they contradicted the events as Amy wrote them. I am concern about the fair-minded decision to terminate me is not justified by the facts that I have done nothing wrong. In the April meetings with HR and Renee, I stated HR is supposed to engage in these matters neutrally but it appears they as well as the Legal Department have through caution to the wind and fully joined Amy's cause to get ride of me.

I pray this is not the case.

Ericka Holmes

# EXHIBIT E



June 5, 2024


<u>By email and regular mail</u>
Ericka Holmes
807 Pampas Ricas Drive
Leander TX 78641-87050
<u>Erickaholmes22@gmail.com</u>

Re: Step Three Decision in Appeal of Erika Holmes's Termination

Dear Erika Holmes:

Before me is your Step Three appeal of the University's decision to terminate your employment from the University Health Services Department. Your appeal follows a Step Two hearing on February 27, 2024, and the subsequent Step Two decision by Interim Vice President for Student Affairs, Thomas Dison, to uphold your termination.

Upon review, I have decided to uphold your termination. This decision is final and unappealable in accordance with the provisions of the University's Handbook of Operating Procedures, Section 5-2420, Policies and Procedures for Discipline and Dismissal of Employees.

Sincerely,

Jay Hartzell
President

# Texas Workforce Commission
## A Member of Texas Workforce Solutions

Bryan Daniel, Chairman
Commissioner Representing
the Public

Alberto Treviño, III
Commissioner Representing
Labor

Joe Esparza
Commissioner Representing
Employers

Edward Serna
Executive Director

June 25, 2024

Ericka Holmes
807 Pampas Ricas Dr.
Leander, TX  78641

Re:    Ericka Holmes v University of Texas at Austin/University Health Services
       **NOTICE OF COMPLAINANT'S RIGHT TO FILE CIVIL ACTION**
       EEOC Charge 451-2023-03695

Dear Ericka Holmes:

The above-referenced case was processed by the United States Equal Employment Opportunity Commission or a local agency. Pursuant to Sections 21.252 and 21.254 of the Texas Labor Code, this notice is to advise you of your right to bring a private civil action in state court in the above-referenced case. YOU HAVE SIXTY (60) DAYS FROM THE RECEIPT OF THIS NOTICE TO FILE THIS CIVIL ACTION.

If your case has been successfully resolved by the U. S. Equal Employment Opportunity Commission or another agency through a voluntary settlement or conciliation agreement, you may be prohibited by the terms of such an agreement from filing a private civil action in state court pursuant to the Texas Commission on Human Rights Act, as amended.

The United States Supreme Court has held in Kremer v. Chemical Construction Corporation, 456 U.S. 461 (1982), that a federal district court must generally dismiss a Title VII action involving the same parties and raising the same issues as those raised in a prior state court action under Chapter 21 of the Texas Labor Code. Therefore, filing a lawsuit in state court based on the issuance of this notice of right to file a civil action may prevent you from filing a lawsuit in federal court based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e - et seq.

Sincerely,

Bryan D. Snoddy, Director
Civil Rights Division

**RETAIN ENVELOPE TO VERIFY DATE RECEIVED**

Copy to:
University of Texas at Austin/University Health Services
c/o: Dominique Stafford, J.D.
The University of Texas
Austin, TX  78712



101 E. 15th Street, Room 154 • Austin, Texas 78778-0001 • (512) 463-2642 (T) • (512) 463-2643 (F) • Relay Texas: 800-735-2989 (TDD) 800-735-2988 (Voice) • www.texasworkforce.org
Equal Opportunity Employer / Program



**Electronic Record and Signature Disclosure**

**DocuSign**

## Certificate Of Completion

Envelope Id: 6971452B31374102870BF0E74E8A1B15                      Status: Completed
Subject: June 25, 2024_Holmes_NRTFCA-Letter_451-2023-03695 (1).pdf
docSeqId:
docType:
Source Envelope:
Document Pages: 1                    Signatures: 0                 Envelope Originator:
Certificate Pages: 5                 Initials: 0                   Venessa Hernandez
AutoNav: Enabled                                                  101 E. 15th Street, Room 0154-B
EnvelopeId Stamping: Enabled                                      Austin, TX  78778
Time Zone: (UTC-06:00) Central Time (US & Canada)                 venessa.hernandez@twc.texas.gov
                                                                  IP Address: 161.69.54.47

## Record Tracking

Status: Original                    Holder: Venessa Hernandez          Location: DocuSign
        6/25/2024 6:41:33 PM                venessa.hernandez@twc.texas.gov
Security Appliance Status: Connected  Pool: StateLocal
Storage Appliance Status: Connected   Pool: Texas Workforce Commission- Production    Location: DocuSign
                                      Account

| Signer Events | Signature | Timestamp |
|---|---|---|

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|
| Ericka Holmes<br>erickaholmes22@gmail.com<br>Security Level: Email, Account Authentication<br>(None) | **VIEWED**<br><br>Using IP Address: 104.13.175.14 | Sent: 6/25/2024 7:00:54 PM<br>Viewed: 6/26/2024 4:50:51 PM |

**Electronic Record and Signature Disclosure:**
   Accepted: 6/26/2024 4:50:51 PM
   ID: b1c544c8-8e94-4859-9b25-29badabe119d

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Alex Stewart<br>alex.stewart@twc.texas.gov<br>Civil Rights Investigator<br>Texas Workforce Commission<br>Security Level: Email, Account Authentication<br>(None) | **COPIED** | Sent: 6/25/2024 7:00:53 PM |

**Electronic Record and Signature Disclosure:**
   Not Offered via DocuSign

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Lynda Pringle<br>lynda.pringle@twc.texas.gov<br>Investigator<br>Texas Workforce Commission<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | **COPIED** | Sent: 6/25/2024 7:00:53 PM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/25/2024 7:00:54 PM |
| Certified Delivered | Security Checked | 6/26/2024 4:50:51 PM |
| Completed | Security Checked | 6/26/2024 4:50:51 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure |
|---|

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Carahsoft obo Texas Workforce Commission (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

### How to contact Carahsoft obo Texas Workforce Commission:

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

### To advise Carahsoft obo Texas Workforce Commission of your new email address

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at  and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

### To request paper copies from Carahsoft obo Texas Workforce Commission

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to  and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

### To withdraw your consent with Carahsoft obo Texas Workforce Commission

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to heather.hall@twc.state.tx.us and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Carahsoft obo Texas Workforce Commission as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Carahsoft obo Texas Workforce Commission during the course of your relationship with Carahsoft obo Texas Workforce Commission.

# 3. 08/26/2024 Letter Requesting Citation - University of Austin at Texas

8/26/2024 11:39 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-005391
Selina Hamilton




THE LAW OFFICES OF NICKOLAS A.

# SPENCER & ASSOCIATES, PLLC.

ONE RIVERWAY, SUITE 1700
HOUSTON, TX 77056
713-917-6814
NAS@NASLEGAL.COM

NICKOLAS A. SPENCER, J.D., MA
*MANAGING ATTORNEY*

GABRIELLE ILOCHI, J.D.
*ATTORNEY*

STEPHANIE J. WELLNER, J.D.
*OF COUNSEL*

August 26, 2024

Civil and Family Court Facility
1700 Guadalupe
Room 3.200
Austin, TX 78701

Re:        Cause No. D-1-GN-24-005391: Ericka Holmes v. University of Texas at Austin,
           Inc., and Laurel Hinton; In the 166th Judicial District Court of Bexar County, Texas.

To the Honorable Clerk:

Attached to this filing is the proper fee for copies for the Plaintiff's Original Petition & Request for
Disclosure for the Honorable Judge..

Respectfully,

By: */s/* Nickolas A. Spencer
Texas Bar No. 24102529
Spencer & Associates, PLLC.
One Riverway, Suite 1700
Houston, Texas 77056
(713) 863-1409
nas@naslegal.com
Attorney for Plaintiff

1

# 4. 08/26/2024 Citation Issued University of Texas at Austin

C I T A T I O N

T H E   S T A T E   O F   T E X A S

**CAUSE NO. D-1-GN-24-005391**

ERICKA HOLMES

, PLAINTIFF(S)

   vs.

UNIVERSITY OF TEXAS AT AUSTIN

, DEFENDANT(S)

TO:    **UNIVERSITY OF TEXAS AT AUSTIN**
       **BY SERVINGITS PRESIDENT JAY HARTZELL**
       **MAIN BUILDING**
       **110 INNER CAMPUS RIVE**
       **AUSTIN, TX 78712**
       **OR WHEREVER HE MAY BE FOUND**

Defendant, in the above styled and numbered cause:
**YOU HAVE BEEN SUED.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."**

Attached is a copy of the **PLAINTIFF S ORIGINAL PETITION** in the above styled and numbered cause, which was filed on **AUGUST 26, 2024** in the **201ST DISTRICT COURT** of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, **AUGUST 26, 2024**

REQUESTED BY:
**GARY L. BLEDSOE**
**6633 HIGHWAY 290 EAST # 208**
**AUSTIN, TX  78723-1157**



Velva L Price
Travis County District Clerk
Civil Family Court Facility (CFCF)
1700 Guadalupe Street, P.O. Box 679003 (78767)
Austin TX 78701

**Selina Hamilton, Deputy**

R E T U R N

Came to hand on the _____ day of _____, _____ at _____ o'clock _____M., and executed at
_____ within the County of _____ on the _____ day
of _____, _____, at _____ o'clock _____M., by delivering to the within named
_____, each in person, a true copy of this citation together with
the **PLAINTIFF S ORIGINAL PETITION** accompanying pleading, having first attached such copy of such citation to such copy of
pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ _____

_____
Sheriff / Constable / Authorized Person

Sworn to and subscribed before me this the

_____ day of _____, _____.    By:_____

_____
Printed Name of Server

_____
_____ County, Texas
Notary Public, THE STATE OF TEXAS
**D-1-GN-24-005391**                **SERVICE FEE NOT PAID**

# 5. 08/26/2024 Executed Citation - University of Texas at Austin

8/26/2024 5:06 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-005391
Norma Ybarra

CITATION
THE STATE OF TEXAS
CAUSE NO. D-1-GN-24-005391

ERICKA HOLMES

, PLAINTIFF(S)

vs.

UNIVERSITY OF TEXAS AT AUSTIN

, DEFENDANT(S)

TO:    UNIVERSITY OF TEXAS AT AUSTIN
       BY SERVINGITS PRESIDENT JAY HARTZELL
       MAIN BUILDING
       110 INNER CAMPUS RIVE
       AUSTIN, TX 78712
       OR WHEREVER HE MAY BE FOUND

Defendant, in the above styled and numbered cause:
YOU HAVE BEEN SUED.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk
who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served
this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk,
you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made
no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."

Attached is a copy of the PLAINTIFF S ORIGINAL PETITION in the above styled and numbered cause, which was filed on
AUGUST 26, 2024 in the 201ST DISTRICT COURT of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office. AUGUST 26, 2024

REQUESTED BY:
GARY L. BLEDSOE
6633 HIGHWAY 290 EAST # 208
AUSTIN, TX  78723-1157



Velva L Price
Travis County District Clerk
Civil Family Court Facility (CFCF)
1700 Guadalupe Street, P.O. Box 679003 (78767)
Austin TX 78701

Selina Hamilton, Deputy

RETURN
Came to hand on the 26ᵀᴴday of August , 2024 at 2:56 o'clock P M., and executed at 2304 Whitis Ave
Suite 438 Austin, TX 78712 within the County of Travis on the 26ᵀᴴday
of August , 2024, at 3:52 o'clock P M., by delivering to the within named Jay Hartzell Accepted
By Janie Perez, Senior Administrative Associate each in person, a true copy of this citation together with
the PLAINTIFF S ORIGINAL PETITION accompanying pleading, having first attached such copy of such citation to such copy of
pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ _____

Sworn to and subscribed before me this the
26ᵗʰ day of August 2024.



Notary Public, THE STATE OF TEXAS
D-1-GN-24-005391

Sheriff/ Constable / Authorized Person

By: _____
Lonzo Kerr, Jr. #6425
Printed Name of Server
Travis County, Texas

SERVICE FEE NOT PAID

ELAINE MAYS LOFTON
Notary Public, State of Texas
Comm. Expires 10-26-2025
Notary ID 131329659

BLAIRE MAYS LOFTON
Notary Public, State of Texas
Comm. Expires 10-26-2025
Notary ID 13132659

# 6. 09/13/2024 Defendant's General Denial, Original Answer, and Affirmative Defenses

9/13/2024 10:14 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-005391
Susan Schmidt

CAUSE NO. D-1-GN-24-005391

| | | |
|---|---|---|
| ERICKA HOLMES, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| UNIVERSITY OF TEXAS AT | § | |
| AUSTIN, | § | |
| *Defendant.* | § | 201ST JUDICIAL DISTRICT |

**DEFENDANT THE UNIVERSITY OF TEXAS AT AUSTIN'S
ORIGINAL ANSWER AND AFFIRMATIVE DEFENSES TO
PLAINTIFF'S ORIGINAL PETITION**

The University of Texas at Austin ("Defendant") respectfully files this Original Answer and Affirmative Defenses to Plaintiff's Original Complaint.

## I.    GENERAL DENIAL

Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendant asserts a general denial, and without waiving and subject to the affirmative defenses set forth herein, generally denies each and every allegation in Plaintiff's Original Petition, including the Prayer thereof, and any amended or supplemental Petition Plaintiff may subsequently file. Defendant demands that Plaintiff be required to prove such allegations by a preponderance of the credible evidence as required by law.

## II.    AFFIRMATIVE AND OTHER DEFENSES

Pleading further, Defendant hereby asserts the following affirmative defenses to the extent they may apply:

1.    Defendant asserts its claim to the affirmative defense of sovereign immunity from suit as

1

to any claims for which there has been no statutory or other waiver and to which this affirmative defense applies.

2.    Defendant asserts sovereign immunity from liability, which bars Plaintiff's recovery to such an extent that this affirmative defense may apply.

3.    Plaintiff fails to state a claim upon which relief can be granted.

4.    Defendant's actions regarding Plaintiff would have been the same even in the absence of facts Plaintiff claims resulted in discrimination, retaliation, hostile work environment, and wrongful discharge.

5.    Defendant asserts the affirmative defense of failure to exhaust administrative remedies for all claims to which it may apply.

6.    Plaintiff failed to mitigate her alleged damages as required by law.

7.    Any damages that Plaintiff may assert are subject to the applicable damage cap in Chapter 41 of the Texas Civil Practices and Remedies Code, the Texas Labor Code, Title VII, and all other applicable limitations (constitutional, statutory, and common-law) on awards of compensatory and punitive damages.

8.    Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations and/or doctrine of laches, estoppel, and/or unclean hands. To the extent Plaintiff's claims are based on acts that occurred outside any applicable limitations period, the claims are time-barred.

9.    To the extent that Plaintiff's claims or representations before any judicial or administrative body are inconsistent with the claims or representations that Plaintiff makes in this lawsuit, Plaintiff's claims are barred by the doctrine of judicial estoppel.

10.    Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff's own acts or omissions caused or contributed to the alleged injuries.

2

11.   To the extent that Plaintiff's claims exceed the scope of any charge of discrimination, retaliation, or harassment that Plaintiff filed with the Equal Employment Opportunity Commission and/or the Texas Workforce Commission, this Court lacks subject-matter jurisdiction over such claims or such claims are otherwise barred.

12.   Defendant denies that it took any action as the result of any unlawful motives. Pleading in the alternative, the same action(s) would have been taken for legitimate permissible reasons.

13.   Plaintiff is not entitled to any damages because any adverse employment actions Plaintiff claims to have suffered; any adverse employment actions alleged in Plaintiff's Original Petition were justified by legitimate, nondiscriminatory reasons not associated with Plaintiff's membership in any protected class.

14.   Any relief to which Plaintiff may be entitled is barred or otherwise affected by the after-acquired evidence doctrine.

15.   Defendant asserts that it exercised reasonable care to prevent and promptly correct any harassing behavior, and that Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by Defendant or to avoid harm otherwise.

16. Defendant reserves the right to amend or supplement its answer and/or defenses as discovery progresses in this lawsuit.

### III.    PRAYER

Defendant prays that Plaintiff's claims be dismissed with prejudice and that all requests for relief be denied. Defendant further prays that all costs be taxed and adjudged against Plaintiff and that the Court grant Defendant all other relief, both general and special, at law and in equity, to which it may be justly entitled.

3

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

/s/ *Kirstin M. Erickson*
**KIRSTIN M. ERICKSON**
Assistant Attorney General
Texas Bar No. 24134194
Kirstin.Erickson@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: (512) 475-4031 Fax: (512) 320-0667
**COUNSEL FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2024, a true and correct copy of the foregoing instrument has been served electronically through the electronic-filing manager, File and Serve Texas, in compliance with Texas Rule of Civil Procedure 21a to all counsel of record.

/s/ *Kirstin M. Erickson*
**KIRSTIN M. ERICKSON**
Assistant Attorney General

4

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Kirstin Erickson
Bar No. 24134194
nicole.myette@oag.texas.gov
Envelope ID: 91989553
Filing Code Description: Answer/Response
Filing Description: DEFENDANT THE UNIVERSITY OF TEXAS AT AUSTIN'S ORIGINAL ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S ORIGINAL PETITION
Status as of 9/13/2024 12:09 PM CST

Associated Case Party: UNIVERSITY OF TEXAS AT AUSTIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kirstin Erickson | | kirstin.erickson@oag.texas.gov | 9/13/2024 10:14:32 AM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 9/13/2024 10:14:32 AM | SENT |

Associated Case Party: ERICKA HOLMES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Robert Notzon | 797934 | Robert@NotzonLaw.com | 9/13/2024 10:14:32 AM | SENT |
| Nickolas Spencer | 24102529 | nas@naslegal.com | 9/13/2024 10:14:32 AM | SENT |
| Gary Bledsoe | | gbledsoe@thebledsoelawfirm.com | 9/13/2024 10:14:32 AM | SENT |