## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **ERICKA HOLMES,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Civil Action No.:** |
| | § | **124-CV-1135** |
| **THE UNIVERSITY OF TEXAS AT AUSTIN,** | § | |
| | § | |
| **Defendant.** | § | |

## MOTION FOR RECONSIDERATION UNDER RULE 59(e) OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO AMEND COMPLAINT

**TO THE HONORABLE ROBERT PITMAN, UNITED STATES DISTRICT JUDGE:**

COMES NOW, Plaintiff Ericka Holmes ("Plaintiff"), by and through undersigned counsel, and respectfully submits this Motion for Reconsideration Under Rule 59(e) or, in the Alternative, Motion for Leave to Amend Complaint, and in support thereof shows this Court as follows:

## I. INTRODUCTION

**This Court's September 2, 2025 Order granting Defendant's Motion to Dismiss contains fundamental legal errors that warrant reconsideration and correction under Federal Rule of Civil Procedure 59(e)**. The Order dismissed all employment discrimination claims based on erroneous applications of sovereign immunity doctrine and overly restrictive pleading standards that conflict with Fifth Circuit precedent.

Holmes's lawsuit alleges that the University of Texas at Austin ("UT") subjected her to unlawful employment practices on the basis of **race, age, and retaliation**, and violated her **due process** rights in the manner of her termination. Holmes not only complained about retaliation but was a real spokesperson for student safety when she addressed issues of deficient work and staffing that

were a danger to UT students. Holmes is a Black female over 40 who dedicated 15 years as a Licensed Vocational Nurse at UT's University Health Services. In late 2022, a younger white nurse was placed in supervisory authority over Holmes, after which Holmes was immediately stripped of duties and systematically denied training, Holmes's internal complaints about "discriminatory" treatment and about patient safety were met not with remediation, but with escalating retaliation and pretextual discipline. UT terminated Holmes in mid-2023 on grounds that were a thinly veiled pretext – including her refusal to sign an overbroad attestation and her lawful recording of workplace interactions – effectively silencing her and purging an older Black worker from the department.

**The Court should grant this motion because the dismissal order contains clear errors of law regarding sovereign immunity scope, pleading standards, and liberal amendment policy.**

## II. FACTUAL BACKGROUND

During her fifteen years at UT, Holmes became well known by management and her co-workers as an exemplary employee. Management consistently gave her positive evaluations, and Holmes's co-workers regularly came to her for assistance and advice. Holmes was a staple of the nurse community. She did her job, and she did well. But on December 19th, 2022 UT appointed Amy Garvey, a white female under the age of 40, to a supervisory role above Holmes. This appointment forged the crucible that would mold a work environment of incessant hostility, retaliation, and discrimination.

### A. Timeline of Key Events

**December 19th 2022;** Amy Garvey is Appointed the Nurse Manager of General Medicine

**January 26th, 2023**; Holmes has her initial meeting with Garvey. In this meeting Garvey discusses changes to her job duties that completely alter the identity of her work responsibilities;

Garvey documents Holmes as not following policy and patient safety regarding tips of syringes; Garvey talks to Dr. Cortez about Holmes' decision to use a different tip for ear irrigation procedure. Garvey states Dr. Cortez said Holmes' version of the procedure has increased odds of bleeding and inflammation. However, Dr. Hines informed her that her decision was acceptable given the anatomy of the patient's ear canal (Plaintiff's Original Petition P5, Exhibit L JN).

**Feb 27th, 2023**: Holmes successfully performs an ear irrigation, but is written up by Garvey for not following the new policy she has yet to receive training on; Holmes has a conversation with Amy Garvey and Norma Arima regarding her job responsibilities and Holmes' request for a job description in her Workday. They also discuss policy on specific tips for syringes in the ear irrigation process.

**March 24th, 2023**; Level 1 Reminder is given to Holmes

**March 26th, 2023**; Holmes requests discussion with Monica and Tracy regarding level 1 reminder (Exhibit M JN)

**March 27th, 2023**; Holmes files a formal grievance alleging discrimination (Exhibit E JN). The discrimination alleged is from an email sent to CMDR alleging being singled out, demoralized, harassed, and subjected to unfair treatment and degradation in the presence of others by Amy Garvey (Exhibit N JN).

**March 29th, 2023**; Holmes meets with Tracy and Monica in HR to discuss level 1 reminder and disparate treatment. Holmes explains meetings are being held without her knowledge, and she is being isolated from other nurses, to the clinic in the back of the building (Exhibit O JN).

**March 31st, 2023**; Holmes emails Amy Garvey, Tracy Brzozowski, and Monica Dowd her response to their Level 1 Reminder. In Holmes' responses she outlines that on 1/26/23 she met with Amy Garvey and Garvey gave her new job duties that were strikingly different from the ones she had been performing for 15 years. In the email it is mentioned that Garvey acknowledges

Holmes was absent from training on new policies relating to ear irrigation techniques. which further stresses the effects of management altering the work environment and impacting job performance (Exhibit P JN); Holmes is excluded from another meeting between Garvey and the other GM nurses. Holmes reported this. After the meeting and the nurses returned to the floor, Garvey avoided Holmes and would not speak to her (Exhibit O JN).

**April 3rd, 2023**; Meeting with Kouang in CMDR to discuss disparate treatment. "I went on record to state the Respondent had done nothing to decrease the increased probability of unintended mistakes in patient care by processing a full schedule with a severely overworked and understaffed GM clinic. The informal counsel accused me of mistakes as I stated one could be reprimanded for, but the mistakes the Respondent accused me of making were mistakes of the manager who put the blame on me."  (Exhibit D).

**April 4th, 2023**; Email sent to Lauren Harper in SWS informing her that she needed help with the unethical practices of management that are putting her employment at risk  (Exhibit Q JN).

**April 5th, 2023**; Amy Garvey alters some of the dates on the level 1 reminder that she issued. She states, "We have reviewed your response and have determined no further action is needed." Effectively deciding herself that Holmes' engagement in the appeal process is done, and the concerns she raised do not need to be addressed (Exhibit R JN).

**April 6th, 2023**; Holmes meets with Lauren Harper in SWS via Zoom, to discuss Amy Garvey's, "unethical treatment and disdain towards me." (Exhibit O JN).

**April 7th, 2023**; Holmes requests a second time that Amy Garvey provide her with documentation that supported the issued Level 1 Reminder, as is required by UT policy, and Garvey failed to provide the requested documentation.

**April 9th, 2023**; Holmes submits an Alternative Dispute Resolution form that reports the discrimination, retaliation, and hostility that she documented (Exhibit S JN).

**April 11th, 2023**; Garvey responds to Holmes' 4/7 request for supporting documentation, but is non-responsive, stating "Your response will be stored with your Level 1 reminder letter in the personnel file. No further actions are needed." (Exhibit T JN).

**April 12th, 2023**; Holmes requests Garvey to perform the ear irrigation procedure in accordance with the new policy so that she can understand why she received a write-up for improper procedure. Garvey performed the procedure, but it was botched and incomplete. Nonetheless Garvey reported the procedure was complete, and had a clinician evaluate. The clinician determined the patient needed to have the procedure done again. (Exhibit O JN).

**April 13th, 2023**; RN Lori Ramirez meets with Tracy Brzozowski in HR to bring up a concern about Holmes' carrying around and working on what they called the "Amy Notebook." This would result in Holmes becoming the target of an investigation, and management constantly pulling her aside to private meetings, trying everything they could do to get their hands on her private information (Exhibit B).

**April 14th, 2023**; Ericka Holmes meets with Renee Matthews to discuss her level 1 reminder. Holmes believed she was safe to confide in Matthews the legitimate concerns she had about Amy Garvey's treatment of her. UT's Tracy Brzozowski admits that the purpose of these recordings are for Holmes to defend herself against the Level 1 Reminder (Exhibit F JN).

**April 17th 2023**; Renee Mathews speaks to Tracy about Holmes. Although Matthews may not have intended to, this conversation created the slope that Holmes would slip down as HR and others in management became gravely concerned about what documentation Holmes may have about them and their wrongdoings (Exhibit A).

**April 18th 2023**; Tracy and Renee meet with Holmes to discuss her recordings and the "Amy notebook." In this meeting Holmes asks if protecting her interests through recordings and documentation violates any UT policy. HR and management both inform her that there is no UT

policy that prohibits this, but they claim it is against the "accepted culture." Knowing she is not in violation of any policy, Holmes determines it is in her best interest to continue to record and document management's hostile actions towards her. (Plaintiff's Original Petition P512, Exhibit A).

**April 20th, 2023**; UT's HR, Legal, and compliance make the collective decision to place Holmes on investigative leave to review the documentation they determined **was not** in violation of any UT policy two days prior (Exhibit A).

**April 21st, 2023**; Holmes is placed on investigative leave (Exhibit A). Holmes emails Matthews and Brzozowski requesting her personnel file so that she can have the necessary documents to facilitate their request outlined in their attestation (Exhibit G JN).

**April 24th, 2023**; Even though she did not violate a UT policy, being the good employee she is, Holmes complied with UT's request and uploaded her files and recordings to UT Box (Exhibit A).

**April 27th, 2023**; HR sends an attestation to Holmes for her to sign and confirm that she has turned over everything she has related to UT business, even though Holmes had just complied by uploading her files to UT box three days prior (Exhibit A). Holmes informed them that she could not in good conscience sign and be certain of such an overly broad request, but assured them **she was willing to sign** an attestation provided they collectively arrived at more appropriate wording and a more narrow scope (Plaintiff's Original Petition P14, Exhibit H JN).

**April 28th, 2023**; Holmes attempts to edit some of the concerning wording in the attestation she received. She also sends an email to HR to explain this process to them. (Plaintiff's Original Petition P14, Exhibit F JN); Holmes sends an attestation cover letter to Renee Matthews. (Exhibit H JN).

**May 3rd, 2023**; Holmes emailed Brzozowski, Matthews, and Garvey informing them, "*I would like to sign your attestation, but I have my concerns doing so because it is very broad.*" Holmes

further stipulates that she has consistently participated in this process by adhering to requests, but UT's legal department has been fickle in their everchanging requests to her.  (Exhibit H JN).

**May 5th, 2023**; Holmes emails Renee Matthews and the HR staff reporting being subjected to a hostile work environment, threatened and harassed as a result of the personnel actions she has taken (Plaintiff's Original Petition P15, Exhibit I JN).

**May 9th, 2023**; Renee Matthews informs Holmes that no HIPAA violations were found in the materials that she submitted to them (Plaintiff's Original Petition P20, Exhibit O JN).

**May 17th, 2023**; Holmes receives an Intent to Terminate Employment Letter signed by Amy Garvey and Renee Matthews (Exhibit A). Of the four reasons they list, two are blatantly false. Holmes never refused to sign an attestation, in fact she expressed willingness to sign one they collaborated on (Exhibit H JN). Holmes also did not work on the personal notebook during work time in clinical spaces. She had two notebooks, one for work and one for protection (Exhibit B).

**May 19th, 2023**; Holmes sends an email response to the Intent to Terminate Employment letter she received two days prior. In this email Holmes alleges age discrimination when she states, "I am the oldest UHS Nurse in the GM Clinic." Holmes also stipulates that UT's demand that she turn over any and all materials she has after voluntarily complying to their initial request is, "unreasonable, oppressive, and designed to lead to my termination."

**May 22nd, 2023**; Holmes receives her Termination Letter from UT, and she submits an appeal to Dr. Hines for review (Exhibit J JN).

**May 30th, 2023**; Holmes emails Doctor Terrance Hines to appeal her termination. Holmes points to differential treatment, stating that management is providing the newer nursing staff more opportunities by permitting them to work with binders, but they are terminating her for the use of a binder  (Exhibit J JN).

**August 10th, 2023**; Holmes emails DIA Associate Vice President, John Dalton, and stipulates that the email she received from him is belittling and antagonistic. She further states that Dalton's refusal to permit her appeal to go forward is a retaliatory action (Exhibit K JN).

**August 17th, 2023**; Holmes emails Margie Corbett to express her frustrations with John Dalton taking a biased approach to her appeal process. Holmes alleges that Dalton mishnadled the facts, and that this is evidence of UT engaging in institutional discrimination (Plaintiff's Amended Complaint P7, Exhibit K JN).

### III. STANDARD FOR RULE 59(e) MOTIONS

**Rule 59(e) motions correct manifest errors of law and ensure district court orders conform to controlling precedent**. A Rule 59(e) motion is appropriate when the court has "patently misunderstood a party, made a decision outside the adversarial issues presented, made an error not of reasoning but of apprehension, or where a controlling or significant change in the law has occurred." *Templet v. HydroChem Inc.*, 367 F.3d 473, 478-79 (5th Cir. 2004). **This standard is clearly met where the Court misapplied controlling Fifth Circuit precedent on sovereign immunity, discrimination pleading standards, and amendment procedures**.

### IV. SOVEREIGN IMMUNITY ERRORS REQUIRE CORRECTION

**A. Race Discrimination Claims Satisfy Federal Pleading Standards**

      **The Court's dismissal based solely on absence of a "nearly identical comparator" applies impermissibly restrictive standards conflicting with recent Fifth Circuit precedent.** The Fifth Circuit's decision in *Hamilton v. Dallas County*, (5th Cir. 2023), eliminated the "ultimate employment decision" requirement and broadened actionable discrimination to include changes in "terms, conditions, or privileges of employment." The Supreme Court has explicitly held that *"an employment discrimination complaint need not contain specific facts establishing a prima facie case"*, as the prima facie elements are an evidentiary standard, *"not a pleading requirement."* *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-15 (2002). The Fifth Circuit likewise instructs that a plaintiff need only allege *"facts going to the ultimate elements of the claim to survive a motion to*

*dismiss"* and a court must not heighten the standard by demanding comparator evidence at the Rule 12 stage. Accordingly, the Court should reconsider.

**1. Supervisor Comparator Analysis Is Factually Supported**

The Court's conclusion that "Garvey was Plaintiff's supervisor" and cannot serve as a comparator misapplies precedent. While supervisors cannot always serve as comparators, the analysis depends on whether both shared the same ultimate decision-maker. Here, ultimate employment decisions affecting both Plaintiff and Garvey were made by higher-level administrators, making them similarly situated.

The Second Circuit in *Lenzi v. Systemax, Inc.* (2d Cir. 2019) provides persuasive authority that discrimination claims may proceed without traditional comparator evidence when sufficient circumstantial evidence exists.

**2. Alternative Theories Support Discrimination Claims**

Plaintiff alleges that upon Garvey's appointment, she was reassigned to "tasks that non-licensed nurses were permitted to do," excluded from training, and subjected to increased scrutiny not applied to non-Black employees. This pattern supports viable discrimination claims under multiple theories.

**3. Age Discrimination Claims Are Independently Viable Under Texas Labor Code Chapter 21**

**Even if federal ADEA claims face sovereign immunity challenges, Plaintiff's age discrimination claims remain viable under Texas Labor Code Chapter 21, which applies to state university employers and provides independent grounds for relief**. Texas Labor Code Section 21.101 specifically addresses age discrimination, stating that "the provisions of this chapter referring to discrimination because of age or on the basis of age apply only to discrimination against an individual 40 years of age or older".

The Texas Commission on Human Rights Act (TCHRA), codified in Chapter 21 of the Texas Labor Code, provides comprehensive protection against age discrimination for employees of state and local government entities, including state universities. Texas Labor Code Section 21.051 makes it "an unlawful employment practice for an employer... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's... age."

Significantly, Chapter 21 applies to "all state and local government entities no matter how many employees they have," making the University of Texas at Austin directly subject to state age discrimination prohibitions. Unlike the federal ADEA, which faces sovereign immunity barriers against state employers, Chapter 21 represents Texas's own waiver of sovereign immunity for employment discrimination claims, including age-based discrimination.

The factual allegations that Plaintiff, a woman over 40, was subjected to adverse employment actions by a supervisor "substantially younger than Plaintiff" and was "excluded from training sessions while younger employees were included" state viable age discrimination claims under Chapter 21 that survive the motion to dismiss regardless of federal ADEA sovereign immunity issues. **The Court's narrow focus on comparator evidence ignored viable alternative theories and failed to address the independent viability of state law age discrimination claims under Chapter 21.**

**B. Section 1983 Individual Capacity Claims Survive Sovereign Immunity**

**The Court's conclusion that Section 1983 due process claims are "barred by sovereign immunity" fundamentally misunderstands individual capacity doctrine.** Section 1983 claims against state officials in individual capacities are not barred by sovereign immunity because such suits seek damages from individual defendants, not the state treasury.

Plaintiff's proposed amendment specifically identifies President Hartzell "in his individual capacity," removing the sovereign immunity bar entirely. The Court's factual findings support individual liability, acknowledging that specific officials implemented policies violating Plaintiff's due process rights. **The dismissal of Section 1983 claims based on sovereign immunity was legally erroneous given the individual capacity allegations.**

**C. State Law Claims Require Analysis of Statutory Immunity Waivers**

**The Court's dismissal of state law claims failed to analyze whether Texas has waived immunity for specific employment claims alleged**. Texas Government Code Section 311.034 and Local Government Code Section 271.052 provide limited waivers for employment-related claims. The Texas Commission on Human Rights Act (TCHRA) contains specific provisions regarding state employer liability. **The blanket dismissal without proper analysis of statutory immunity waivers was premature and legally insufficient** (Plaintiff's Amended Complaint P1,2).

**V. DISCRIMINATION PLEADING STANDARDS WERE MISAPPLIED**

**A. Race Discrimination Claims Satisfy Federal Pleading Standards**

**The Court's dismissal based solely on absence of a "nearly identical comparator" applies impermissibly restrictive standards conflicting with recent Fifth Circuit precedent**. The Fifth Circuit's decision in *Hamilton v. Dallas County*, (5th Cir. 2023), eliminated the "ultimate employment decision" requirement and broadened actionable discrimination to include changes in "terms, conditions, or privileges of employment".

**1. Supervisor Comparator Analysis Is Factually Supported**

The Court's conclusion that "Garvey was Plaintiff's supervisor" and cannot serve as a comparator misapplies precedent. While supervisors cannot always serve as comparators, the analysis depends on whether both shared the same ultimate decision-maker. Here, ultimate employment decisions affecting both Plaintiff and Garvey were made by higher-level administrators, making them similarly situated.

The Second Circuit in *Lenzi v. Systemax, Inc.* (2d Cir. 2019) provides persuasive authority that discrimination claims may proceed without traditional comparator evidence when sufficient circumstantial evidence exists. Furthermore, in *Zamora v. City of Houston, 798 F.3d 326* (5th Cir. 2015), The Fifth Circuit established a "cat's paw theory" of liability under Title VII retaliation. The "cat's paw theory" permits a supervisor to be a comparator when a plaintiff shows that the supervisor motivated by retaliatory animus influenced the actual decisionmaker to take an adverse action. This is clearly the case with Amy Garvey. She was not the ultimate decision maker but she

pushed Renee Matthews, who managed both Garvey and Holmes, to terminate Holmes because she feared what documentation of misdeeds Holmes may have in her personal binder and recordings. Indeed, it is not even invariably true that supervisors cannot be comparators. *Smith v. Kittle Property Group, Inc*., 2025 WL 315523 (2025).

**2. Alternative Theories Support Discrimination Claims**

Plaintiff alleges that upon Garvey's appointment, she was reassigned to "tasks that non-licensed nurses were permitted to do," excluded from training, and subjected to increased scrutiny not applied to non-Black employees. This pattern supports viable discrimination claims under multiple theories. **The Court's narrow focus on comparator evidence ignored viable alternative theories and applied overly restrictive pleading standards**.

**B. Age Discrimination Claims Present Sufficient Circumstantial Evidence**

**The Court's dismissal based on absence of replacement evidence applies unnecessarily restrictive interpretation conflicting with flexible pleading standards**. Age discrimination may be proven through various theories beyond direct replacement, including age-related comments, exclusion from opportunities, and patterns targeting older employees.

Plaintiff's allegations that she was subjected to different treatment following appointment of a supervisor "substantially younger than Plaintiff" and was "excluded from training sessions while younger employees were included" support viable age discrimination theories. The Court's analysis in *Harris v. City of Houston* (5th Cir. 2022) established that age discrimination requires "age-specific references" but not direct replacement evidence. **The dismissal for lack of replacement evidence applied an impermissibly narrow standard ignoring viable alternative theories**.

**C. Retaliation Claims Meet Required Elements**

**The Court's finding that complaints were too "vague" to constitute protected activity applies a "magic words" requirement conflicting with Fifth Circuit precedent emphasizing substance over terminology**. Plaintiff's statement that the "Level 1 Reminder was unfounded, not in accordance with University rules, based on false information and that it was discriminatory" clearly communicates discriminatory treatment (Plaintiff's Amended Complaint P10). The Court's

determination to the contrary is regrettable. The law is far more forgiving: an employee's complaint is protected under Title VII's opposition clause if it alerts the employer to the employee's reasonable belief that unlawful discrimination (e.g., based on race, sex, age, etc.) is occurring. *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000) (Title VII protects an employee who has *"opposed any practice made an unlawful employment practice"* or *"made a charge…or assisted in any manner in an investigation"* of such practices; the employee need only have a reasonable, good-faith belief that the practice is unlawful to be protected).

Moreover, Holmes's email (referenced in her response brief at Dkt. 19, and presumably part of the record) explicitly mentioned age. The Court acknowledged that *"the email Plaintiff references…mentions age"*. This presumably refers to an April 2023 email Holmes sent summarizing her concerns after meeting the Nursing Director, wherein she noted age (and other factors) as part of her complaint. While the Court discounted that email because it was not attached to the complaint, the substance is telling: Holmes did connect her complaint to age (and likely race). Even absent the email, her conversation with the Nursing Director on April 13, 2023 was protected. Holmes reported what she believed was unfair, targeted treatment by her supervisor. In doing so, she was "opposing" the hostile environment and discrimination she was experiencing. True, Holmes also raised patient safety issues in that meeting, which could independently fall under whistleblower protections. But nothing in Title VII says an employee's complaint cannot serve dual purposes (ethical concerns and discrimination concerns)

The Fifth Circuit in *Satterwhite v. City of Houston*, No. 14-20240 (5th Cir. 2015), established that protected activity determinations must consider totality of communications rather than requiring specific legal formulations. The temporal proximity between Plaintiff's HR meeting "on or about March 29, 2023" and subsequent termination less than two months later establishes strong causal connection.

In *Evans v. City of Houston*, 246 F.3d 344 (5th Cir. 2001), the Fifth Circuit held that "time lapse of up to four months has been found sufficient to satisfy the causal connection". Similarly, *Feist v. Louisiana Dept. of Justice*, 730 F.3d 450, 454 (5th Cir. 2013), noted four-month temporal proximity may satisfy causation requirements. **The Court's restrictive interpretation of protected activity requirements warrants reconsideration**.

**D. Hostile Work Environment Claims Are Adequately Alleged**

**The Court's conclusion that allegations "do not rise to the high standard of objectively unreasonable" mischaracterizes factual allegations and applies objective standard prematurely**. Plaintiff alleges sustained harassment including "openly questioning Plaintiff's work to put Plaintiff down in front of her co-workers," staging setups to embarrass Plaintiff, and systematically excluding her from opportunities.

The Supreme Court's guidance in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), requires considering frequency, severity, physical threat, humiliation, and work interference. The circumstantial evidence of discriminatory motivation is strong given harassment by a white supervisor under 40 targeting a Black employee over 40. The totality of evidence reveals a systematic pattern of stripping Plaintiff of professional authority and dignity, as she was methodically divested of core responsibilities she had successfully performed for over fourteen years and reassigned to "tasks that non-licensed nurses were permitted to do". Plaintiff was subjected to a different set of rules and expectations than her younger, white colleagues, deliberately excluded from training sessions while being held accountable for new procedures she was never taught, creating impossible performance standards designed to justify adverse action. Most egregiously, Plaintiff was subjected to anonymous complaints about her work materials in direct violation of University Policy 5-2420, which explicitly requires disclosure of complainant identities, yet university officials completely refused to provide this information. When Plaintiff sought assistance through university departments allegedly designed to address workplace concerns—including Human Resources, Conflict Management, and Ethics and Compliance—she was systematically denied meaningful support, with these very departments becoming instruments of retaliation rather than protection. This pattern of institutional abdication demonstrates a coordinated effort to force out a longtime Black employee over 40 through methods that would not have been tolerated if applied to younger, white employees. **The dismissal based on insufficient objective hostility misapplied established standards**.

**VI. LEAVE TO AMEND WAS ERRONEOUSLY DENIED**

**A. Due Process Property Interest Claims Present Viable Constitutional Theories**

**The Court's determination that Plaintiff lacks a "legally cognizable property interest" as an "at-will employee" ignores specific allegations regarding university handbook provisions and established procedural expectations that create legitimate entitlement to continued employment under well-established constitutional doctrine**. Public employees may acquire property interests in employment through various mechanisms beyond formal tenure systems, including handbook provisions, policy statements, established practices, and reasonable expectations created by employer conduct.

The Supreme Court's foundational analysis in *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972), and *Perry v. Sindermann*, 408 U.S. 593, 602-03 (1972), established that property interests in public employment may arise from multiple sources including "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Texas has also long recognized a liberty interest which was given no weight in the Court's Order Dismissing the case. In *Rosenstein v. City of Dallas*, the Court held that "discharge from public employment under circumstances that put the employee's reputation, honor, or integrity at stake gives rise to a liberty interest under the Fourteenth Amendment to a procedural opportunity to clear one's name." 876 F.2d 392 (1989). When defamatory charges are made in connection with termination, due process protections are triggered. *Wilkerson v. University of North Texas*, 223 F.Supp.3d 592 (2016).

The Court specifically recognized that state universities may create property interests through "written contracts" or "a clear practice or mutual understanding that certain employees shall have the equivalent of tenure."

Texas courts have consistently recognized that public university employment handbooks and policy manuals may create contractual or quasi-contractual rights that rise to the level of property interests protected by procedural due process. The Fifth Circuit has similarly held that specific handbook provisions, when combined with established employment practices and legitimate employee expectations, can create sufficient property interests to trigger constitutional protection.

Plaintiff specifically alleges that her termination violated "provisions of UT's Handbook of Operating Procedures (HOP)" and established disciplinary procedures that required progressive discipline and adequate due process before termination for cause. These allegations, when viewed

in the light most favorable to Plaintiff as required at the motion to dismiss stage, establish the requisite property interest to support viable due process claims under Section 1983.

## 1. University Handbook Provisions Create Legitimate Expectations of Continued Employment

The Supreme Court in *Perry v. Sindermann* explicitly recognized that even without formal tenure, a public employee may have a constitutional claim to job tenure if policies and practices create a legitimate expectation of continued employment. The Court noted that "a person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit."

Here, Plaintiff's allegations that specific university handbook provisions governed disciplinary procedures and required adherence to established protocols before termination create precisely the type of "rules or understandings" that support property interest claims.

Federal courts have consistently held that public employers cannot unilaterally violate their own established policies and procedures in employment termination decisions without providing adequate due process protections. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541 (1985). When university policies create reasonable expectations of continued employment subject to specified procedures, employees acquire constitutionally protected interests in those procedures being followed.

## 2. Procedural Due Process Violations Are Independently Actionable Regardless of At-Will Status

Even if Plaintiff were deemed an at-will employee for purposes of substantive employment rights, she retains independent procedural due process rights regarding the methods and procedures used in employment termination, particularly where specific policies and procedures are established but not followed. The Supreme Court has consistently distinguished between substantive employment rights and procedural protections, holding that procedural due process applies even in situations where substantive rights may be limited.

The allegations that university officials violated established procedures, failed to provide adequate notice of specific charges, denied opportunities for meaningful response, and bypassed progressive

disciplinary requirements support independent procedural due process claims that survive regardless of underlying employment status. These procedural violations, if proven, constitute actionable constitutional deprivations under Section 1983.

**B. Liberal Amendment Standards Mandate Granting Leave to Cure Technical Deficiencies**

**The Court's denial of leave to amend based on futility applies an impermissibly restrictive standard that conflicts with the fundamental liberal amendment policy embodied in Federal Rule 15(a) and consistently enforced by the Fifth Circuit in employment discrimination and civil rights cases**. Federal Rule 15(a)(2) provides that courts "should freely give leave when justice so requires," establishing a presumption in favor of allowing amendments unless clear prejudice, bad faith, or obvious futility can be demonstrated.

The Supreme Court in *Foman v. Davis*, 371 U.S. 178, 182 (1962), emphasized that the Rule 15(a) standard requires courts to liberally grant leave to amend "in the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."

The Fifth Circuit has consistently emphasized that district courts should liberally grant leave to amend, particularly in employment discrimination and civil rights cases where plaintiffs may need opportunities to cure technical pleading deficiencies while developing complex factual records. *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 994 (5th Cir. 2005); *Marucci Sports, L.L.C. v. National Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014).

**1. Proposed Amendments Directly Address Court's Specific Concerns**

Plaintiff's proposed amendments specifically respond to each concern raised in the Court's analysis, demonstrating that the amendments are neither futile nor dilatory but rather represent good faith efforts to cure identified deficiencies. The proposed Second Amended Complaint includes: (1) clarification of specific statutory bases for state law claims with detailed citation to applicable Texas statutes; (2) addition of individual capacity defendants to avoid sovereign immunity barriers; (3) enhanced factual allegations regarding discriminatory conduct with specific

examples and timeline details; and (4) alternative legal theories that do not depend on rejected analytical frameworks.

## 2. Futility Standard Requires Clear Legal Impossibility, Not Mere Difficulty

The futility standard for denying leave to amend requires a showing that the proposed amendments could not possibly state valid claims under any conceivable legal theory, not merely that the claims face potential challenges or require factual development. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). Courts must evaluate proposed amendments under the same liberal notice pleading standards applicable to original complaints, accepting factual allegations as true and drawing reasonable inferences in favor of the pleading party.

Here, the Court's futility determination appears to rest on the same overly restrictive legal standards that led to the erroneous dismissal of the original claims rather than on any clear legal impossibility of stating viable claims under proper legal analysis. When the underlying dismissal is based on legal error, as demonstrated throughout this motion, the denial of leave to amend based on identical legal reasoning compounds the error and constitutes an abuse of discretion.

The Fifth Circuit has repeatedly held that district courts abuse their discretion in denying leave to amend when the denial is based on erroneous legal standards or premature conclusions about claim viability. *United States v. Perez,* 27 F.4th 1101 (5th Cir. 2022); *Villarreal v. Wells Fargo Bank*, N.A., 814 F.3d 763, 767 (5th Cir. 2016). The proper approach requires allowing amendments that might cure deficiencies and permitting factual development through discovery before determining ultimate claim viability.

## 3. No Prejudice or Dilatory Conduct Justifies Denial

The record contains no evidence of bad faith, dilatory conduct, or undue prejudice that would justify denying leave to amend under Rule 15(a) standards. Plaintiff's motion for leave to amend was filed promptly in response to the motion to dismiss, demonstrating good faith efforts to cure perceived deficiencies rather than dilatory tactics or repeated failed attempts at amendment.

Defendant cannot establish undue prejudice from allowing amendments at this early stage of litigation, before significant discovery has occurred or trial preparation has begun. The proposed amendments address legal theories and factual allegations that are closely related to those already

in dispute, requiring no significant additional preparation or case management complications. The liberal amendment policy serves important judicial efficiency goals by allowing resolution of disputes on the merits rather than through technical pleading requirements. Denying leave to amend viable claims based on technical deficiencies wastes judicial resources and prevents proper resolution of underlying civil rights violations that warrant comprehensive judicial review.

**The Court's denial of leave to amend constituted an abuse of discretion that prevented Plaintiff from addressing technical deficiencies while asserting viable legal theories supported by substantial factual allegations and established constitutional doctrine**. The liberal amendment standards embodied in Rule 15(a) require providing meaningful opportunities to cure pleading deficiencies rather than dismissing potentially viable constitutional and civil rights claims based on overly restrictive technical requirements that conflict with federal notice pleading standards.

## VII. ALTERNATIVE THEORIES SUPPORT CLAIM VIABILITY

### A. Pattern and Practice Evidence

**Plaintiff's allegations present systematic discrimination extending beyond individual incidents to institutional patterns of bias**. The appointment of younger, white supervisors who immediately implement adverse changes for older employees of color suggests institutional tolerance for discriminatory practices violating federal civil rights laws.

### B. Pretext Analysis

**The shifting and pretextual explanations for Plaintiff's termination provide strong evidence of discriminatory motivation**. The reasons cited - refusal to sign broad attestations and recording concerns - appear pretextual considering Plaintiff's employment history and timing following discrimination complaints. The university's stated concern about recording in healthcare settings was applied selectively against Plaintiff while ignoring similar conduct by other employees. University officials acknowledged that "other nurses use binders like Holmes" and that "it is not uncommon for employees to tape record work sessions and there is nothing improper about it". The Head Nurse specifically stated that "there is nothing wrong with recording training sessions and that it is appropriate for an employee to record a supervisor in a private office" since "a closed

office is not a healthcare setting. **The totality of evidence regarding pretextual explanations provides compelling support warranting judicial consideration on the merits**.

## VIII. CONCLUSION AND PRAYER FOR RELIEF

**This Court's September 2, 2025 Order contains multiple manifest errors of law requiring correction through Rule 59(e) reconsideration**. The Order's erroneous sovereign immunity application, overly restrictive discrimination pleading standards, and denial of liberal amendment opportunities conflict with established Fifth Circuit precedent and deny Plaintiff access to federal courts for civil rights violations.

The factual allegations present viable claims satisfying federal pleading standards under properly applied legal frameworks. The Court's analysis failed to consider alternative theories, individual capacity exceptions to sovereign immunity, and cumulative discriminatory conduct effects supporting each violation. **The liberal amendment policy requires providing opportunities to cure pleading deficiencies rather than dismissing viable claims based on technical requirements**.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully requests that this Court:

1. **GRANT** this Motion for Reconsideration under Federal Rule of Civil Procedure 59(e) and **VACATE** the September 2, 2025 Order granting Defendant's Motion to Dismiss;

2. In the alternative, **GRANT** Plaintiff leave to file a Second Amended Complaint addressing specific concerns identified in the Court's Order;

3. **REINSTATE** all dismissed claims including race discrimination, age discrimination, retaliation, hostile work environment, due process violations, and state law wrongful termination;

4. **DENY** Defendant's Motion to Dismiss in its entirety and require Defendant to file a responsive pleading to Plaintiff's viable claims;

5. **AWARD** Plaintiff such other and further relief as this Court deems just and proper.

Respectfully submitted,

**GARY BLEDSOE**

*/s/ Gary Bledsoe*

Gary L. Bledsoe
State Bar No. 02476500
The Bledsoe Law Firm, PLLC
6633 E. Highway 290, Suite 208
Austin, Texas 78723-1157
Tel (512) 322-9992
Fax (512) 322-0840
gbledsoe@thebledsoelawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion for Reconsideration has been served upon all counsel of record via the Court's CM/ECF system this 30th day of September, 2025.

/s/Gary Bledsoe